Carrie **CORCORAN**, as executrix of the estate of Eugene Corcoran, deceased, and Carrie Corcoran, Individually, Plaintiffs,

v.

**NEW YORK POWER AUTHORITY and Wedco Corp., Defendants.**

Carrie **CORCORAN**, as executrix of the estate of Eugene Corcoran, deceased, and Carrie Corcoran, Individually, Plaintiffs,

v.

**WESTINGHOUSE ELECTRIC CORP., Defendant.**

Nos. 95 CIV. 5357 (DLC), 95 CIV. 8102 (DLC).

United States District Court, S.D. New York.

July 29, 1996.

Carrie Corcoran, Macungie, PA, pro se.

Sheila L. Birnbaum, Peter J. McKenna, Wendy Fleishman, Skadden, Arps, Slate, Meagher & Flom, New York City, for Defendants.

## OPINION

COTE, District Judge:

Carrie Corcoran, on her own behalf and as Executrix of Eugene Corcoran's estate ("plaintiffs"), filed this action in state court on March 15, 1995. Defendants removed the action and now move to dismiss all of plaintiffs' claims. For the reasons set forth below, the motion is granted in part and denied in part.

## PROCEDURAL BACKGROUND

Plaintiffs, then represented by counsel, filed a lawsuit in New York Supreme Court on March 15, 1995, against defendants New York Power Authority ("NYPA") and WEDCO Corporation ("WEDCO") (the "NYPA action"). Following counsel's withdrawal from the case, the plaintiffs proceeded *pro se* by serving the Summons and Complaint on June 30, 1995, on defendant NYPA and (although the legal sufficiency of service is contested by WEDCO, *see infra*) on WEDCO by delivery of said papers to Prentice–Hall, Westinghouse Electric Corporation's ("Westinghouse") registered agent. Defendants removed this action, pursuant to 42 U.S.C. § 2210, on July 18, 1995.

Thereafter, NYPA and WEDCO moved, on August 14, 1995, to dismiss the entire NYPA action pursuant to Rule 12(b)(4), (5), and (6), Fed.R.Civ.P. In response, the plaintiffs filed a motion on September 5, 1995, "to estop defendant, New York Power Authority, from asserting an affirmative defense regarding the statute of limitations on the plaintiffs' notice of claim or plaintiffs' action" (the "Estoppel motion"). On September 21, 1995, plaintiffs filed an Amended Complaint in the NYPA action and filed a new and separate action against Westinghouse (the "Westinghouse action"). In response to the Estoppel motion, the NYPA cross-moved for summary judgment on September 25, 1995, arguing that plaintiffs' claims against NYPA are barred by the deceased's failure to file a timely notice of claim.[1] Plaintiffs responded to the Rule 12 motions on September 27, 1995, and also sought leave of Court to substitute Westinghouse for WEDCO or, in the alternative, an order consolidating the NYPA and Westinghouse actions. This Court entered an Order consolidating both actions on November 7, 1995. On December 1, 1995, NYPA, WEDCO, and Westinghouse (collectively, the "defendants") moved to dismiss the Amended Complaint and the Complaint in the Westinghouse action pursuant to Rule 12(b)(4), (5), and (6), Fed.R.Civ.P. On December 27, 1995, an Amended Complaint was filed in the Westinghouse action (the "Amended Westinghouse Complaint"). Plaintiffs also filed a Second Amended Complaint in the NYPA action on January 17, 1996.[2] Defendants filed the instant motion to dismiss the Second Amended Complaint and the Amended Westinghouse Complaint on January 11, 1996.

## FACTS

The facts as alleged in the Second Amended Complaint and the Amended Westinghouse Complaint are assumed to be true for the purposes of the 12(b)(6) motion and are as follows. In June 1985, the deceased plaintiff, Eugene Corcoran, was employed by Westinghouse as a millwright. Between

1. This Court held an initial pretrial conference on October 6, 1995, and, *inter alia*, heard argument that the action against Westinghouse may be barred by the statute of limitations. The Court ordered the parties to proceed with discovery on the notice of claim and, if necessary, the statute of limitations issues. As the Court informed the parties at the conference, at the conclusion of discovery the parties may submit additional briefing to complete the summary judgment motion. Such discovery is due to be completed on September 15, 1996; the supplemental briefing will be completed on October 15, 1996.

2. These amended pleadings were served on the defendants on December 21, 1995.

June and August 1985, Mr. Corcoran was assigned to do maintenance work at NYPA's Indian Point 3 nuclear power plant (hereinafter, "IP3"). His assignments included working on the steam turbine and associated steam supply system serving IP3, including an area called the "stop valve." Plaintiffs allege that at the time Mr. Corcoran worked near the stop valve, the steam generator tubes that carried radioactive water were defective and/or corroded, cracked, broken or split, thereby causing leakage of radioactive substances and particles that were deposited in the stop valve. Although NYPA and Westinghouse were aware that the area around the stop valve had been dangerously contaminated by radiation, they "failed to timely alert and warn" Mr. Corcoran. Mr. Corcoran wore no protective clothing and had no equipment to guard him against or alert him of the presence of radiation; consequently, he was exposed to the contaminated stop valve at radiation levels "in excess of applicable regulatory standards." After Mr. Corcoran had worked in the stop valve area "for some time," NYPA surveyed and detected the contamination yet still "failed to immediately barricade the area and post radiation warning signs to prevent unsuspecting persons from entering upon the area." Mr. Corcoran, therefore, was unaware of the contaminated state of the stop valve and continued to work near the stop valve and to be exposed to radiation after NYPA's discovery of the dangerous condition. Following his exposure to the contaminated stop valve, Mr. Corcoran fell ill in June 1985, suffering the effects of "acute radiation sickness." At the time, however, his symptoms were not diagnosed as resulting from radiation exposure, and Mr. Corcoran was unaware that his illness was caused by radiation. Although defendants were aware of the seriousness of the contamination, they made no efforts to provide Mr. Corcoran with medical treatment.

For several years following his work at the IP3 stop valve, Mr. Corcoran "continued to suffer from debilitating illnesses of unexplained etiology and was hospitalized." On March 16, 1992, Mr. Corcoran was admitted to Mid Island Hospital in Bethpage, New York. He was subsequently diagnosed as having "acute/chronic myeloid leukemia, a fatal disease of the body's blood and immune systems which is brought on by excessive exposure to nuclear radiation." Mr. Corcoran died on September 25, 1993. To date, plaintiffs are unaware of the degree of Mr. Corcoran's actual exposure to radiation.

The following undisputed facts are derived from documents beyond the pleadings and shall be considered with respect to the motions to dismiss WEDCO as a defendant in this litigation. In their first Rule 12 motion, defendants attached the affidavit of Cheryl M. Hays, a Westinghouse Manager, who attests that WEDCO was incorporated in the State of Delaware and at all times was a wholly-owned subsidiary of Westinghouse until it was dissolved on May 2, 1978. Hays attests that "[a]t no time has any court entered an order extending WEDCO's capacity to be sued under Delaware Code Annotated 278, 279 or any other provision of law." Hays further attests that "[a]ll of the assets of WEDCO were distributed on or about the time of its dissolution and no assets remain undistributed."

## RULES 12(b)(6) AND 56 STANDARDS

The Court may dismiss an action pursuant to Rule 12(b)(6), Fed.R.Civ.P., only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). In considering the motion, the Court must take "as true the facts alleged in the complaint and draw[ ] all reasonable inferences in the plaintiff's favor." *Jackson National Life Insurance Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699–700 (2d Cir. 1994). The Court can dismiss the claim only if, assuming all facts alleged to be true, plaintiff still fails to plead the basic elements of a cause of action. Finally, a *pro se* complaint such as this one is held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972); *Branham v. Meachum*, 77 F.3d 626, 628–29 (2d Cir.1996).

Although the defendants have moved to dismiss the claims against WEDCO pursuant to Rule 12(b)(6), Fed.R.Civ.P., a court may convert a motion to dismiss into a motion for summary judgment under Rule 56, Fed.R.Civ.P., when "matters outside the pleading are presented to and not excluded by the court." Rule 12(b), Fed.R.Civ.P. A district court may not so convert a motion under Rule 12(b), however, "without sufficient notice to an opposing party and an opportunity for that party to respond." *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir.1995) (citing *In re G. & A. Books, Inc.*, 770 F.2d 288, 294–95 (2d Cir. 1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986)). Thus, to determine whether a district court may properly convert a motion to dismiss into one for summary judgment,

> "The essential inquiry is whether the [party] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings."

*Groden*, 61 F.3d at 1052–53 (quoting *In re G. & A. Books, Inc.*, 770 F.2d at 295). However, "[n]otice is particularly important when a party is proceeding *pro se* and may be unaware of the consequences of his failure to offer evidence bearing on triable issues." *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 767 (2d Cir.1983) (citing cases). Plaintiffs were served with defendants' first Rule 12 motion, which included the Hays affidavit, in August 1995. In response, plaintiffs sought in their September 27, 1995, reply memorandum to substitute Westinghouse for WEDCO, pursuant to Rule 15, Fed. R.Civ.P. Plaintiffs renewed their application through their memorandum of law opposing the instant motion to dismiss. Thus, plaintiffs have had ample notice and a " 'reasonable opportunity to meet facts outside the pleadings.' " *Groden*, 61 F.3d at 1052–53. Therefore, converting the motion into one for summary judgment is appropriate.

Summary judgment is appropriate only when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. When deciding a motion for summary judgment, the Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. of Reading, Pennsylvania v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir.1994). In addition, because plaintiff is acting *pro se*, the Court must "read [plaintiff's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994); *accord Soto v. Walker*, 44 F.3d 169, 173 (2d Cir.1995).

## DISCUSSION

### A. Public Liability Actions Under the Price–Anderson Act

#### 1. Statutory and Regulatory Framework

The parties agree that a "public liability action" ("PLA") pursuant to 42 U.S.C. § 2210(n)(2) of the 1988 amendments to the Price–Anderson Act is the plaintiffs' exclusive right of action. The principal issues are first, the extent to which a PLA preempts plaintiffs' personal injury and related state law claims and, as defendants contend, limits plaintiffs to one single cause of action, and second, the extent to which federal law determines the standard of care in plaintiffs' PLA claims.

A brief historical account of the 1988 Price–Anderson Act Amendments is appropriate. Congressional regulation of nuclear power began with the Atomic Energy Act of 1946, 60 Stat. 755, which designated the nuclear industry a government monopoly. *See In re TMI*, 67 F.3d 1103, 1107 (3d Cir.1995) ("*TMI III*"). The road was paved for private sector involvement, however, with the enactment of the Atomic Energy Act of 1954, 68 Stat. 919, which substituted complete federal control over the nuclear industry with more familiar regulatory means, such as licensing. *Id.* The danger of staggering liabilities associated with nuclear power accidents slowed the entrance into the

nuclear energy field of private industry and convinced Congress of the need for further legislation, resulting in the Price–Anderson Act, 71 Stat. 576 (1957) (the "Act"). The Act provided federal funds to help pay damages caused by nuclear accidents, and it also limited the potential civil liability of nuclear plant operators. *TMI III*, 67 F.3d at 1107. The Act, therefore, "had a dual purpose: 'to protect the public and to encourage the development of the atomic energy industry.'" *Lujan v. Regents of the University of California*, 69 F.3d 1511, 1514 (10th Cir.1995) (citing 71 Stat. at 576, *codified at* 42 U.S.C. § 2012(i)). The Act had three main features:

> 1) It "established a limit on the aggregate liability of those who wished to undertake activities involving the handling or use of radioactive materials"; 2) It channelled public liability resulting from nuclear incidents to the federal government; and 3) It established that all public liability claims above the amount of required private insurance "protection would be indemnified by the Federal Government, up to the aggregate limit on liability."

*O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1095 (7th Cir.1994) (quoting S.Rep. No. 218, 100th Cong., 1st Sess. 2 (1987), *reprinted in* 1988 U.S.C.C.A.N. 1424, 1476, 1477)).

The Act has been amended three times. The 1966 Amendments, *inter alia*, provided for the transfer to federal district courts of all claims arising out of an "extraordinary nuclear occurrence" ("ENO")[3]. *See O'Conner*, 13 F.3d at 1095. Concerned by the unsettled state of state tort law dealing with liability for nuclear incidents, and motivated by a desire to create greater uniformity, the 1966 Amendments also provided that those indemnified under the Act waive common law defenses in the event of an ENO, which

essentially created a "strict liability" system for such disastrous events.

▮▮▮ The Act was most recently amended in 1988 to provide "a mechanism whereby the federal government can continue to encourage private sector participation in the beneficial uses of nuclear materials." *TMI III*, 67 F.3d at 1108 (quoting *In re TMI Litigation Cases Consolidated II*, 940 F.2d 832, 853 (3d Cir.1991) ("*TMI II* ")). Congress was satisfied that

> [t]he Price–Anderson System ... provides persons seeking compensation for injuries as a result of a nuclear incident with significant advantages over the procedures and standards of recovery that might otherwise be applicable under State tort law.

*O'Conner*, 13 F.3d at 1095 (quoting S.Rep. No. 218 at 4). To this end, federal district court jurisdiction was extended beyond ENOs to include all "nuclear incidents";[4] the 1988 Amendments Act also provided for the removal of state court actions (including those pending in state court at the time of the passage of the 1988 Amendments Act), and allowed their consolidation into a single, federal court proceeding. *See* 42 U.S.C. § 2210(n)(2); § 2210(n)(3) (providing for the appointment of a special caseload management panel that, *inter alia*, has powers "to consolidate related or similar claims for hearing or trial"). In addition, a new federal right of action was created—the PLA. Defined as "any suit asserting public liability," 42 U.S.C. § 2014(hh), a PLA encompasses (with exceptions not relevant to the instant action) "any legal liability arising out of or resulting from a nuclear incident or precautionary evacuation." 42 U.S.C. § 2014(w) (defining "public liability"). Given the breadth of the PLA's definition,

> the consequence of a determination that a particular plaintiff has failed to state a

---

3. An ENO is defined as an event in which nuclear-related materials are discharged offsite (or cause offsite radiation) and which the Nuclear Regulatory Commission ("NRC") or the Secretary of Energy "determines to be substantial" and "has resulted or will probably result in substantial damages to persons offsite or property offsite." *42 U.S.C. § 2014(j)*.

4. "Nuclear incident" is defined, in relevant part, as any occurrence [including an ENO] within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material. 42 U.S.C. § 2014(q).

public liability claim potentially compensable under the Price–Anderson Act is that he has no such claim at all. After the [1988] Amendments Act, no state cause of action based upon public liability exists. A claim growing out of any nuclear incident is compensable under the terms of the Amendments Act or *it is not compensable at all*.... At the threshold of every action asserting liability growing out of a nuclear incident, then, there is a federal definitional matter to be resolved: Is this a [PLA]? If the answer to that question is "yes," the provisions of the Price–Anderson Act apply; there can be no action for injuries caused by the release of radiation from federally licensed nuclear power plants separate and apart from the [PLA].

*TMI II*, 940 F.2d at 854–55 (emphasis in original).

■ Although a PLA became the sole means by which a plaintiff could recover for damages sustained in a nuclear incident, Congress determined that the source for the substantive law underlying a PLA would be state law. Congress expressly stated that a PLA

shall be deemed to be an action arising under section 2210 of this title, and *the substantive rules for decision* in such action *shall be derived from the law of the State* in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section.

42 U.S.C. § 2014(hh) (emphasis supplied).[5] Congress, however, also set forth various federal requirements to a PLA, including a limitations period, *see* 42 U.S.C. § 2210(n)(1), venue, *see* 42 U.S.C. § 2210(n)(2), choice of law, *see* 42 U.S.C. § 2014(hh), an upper limit of aggregate liability and limits on the availability of punitive damages, *see* 42 U.S.C. §§ 2210(e) and (s). In summary, as the Seventh Circuit has recently put it, the 1988 Amendments Act

is the latest installment in nearly fifty years of congressional work. During that time, Congress has attempted to encourage the development of domestic nuclear power to the fullest extent through licensing, indemnification, limitation of liability, and consolidation of litigation. Nevertheless, Congress has balanced this encouragement of private sector activity with an acute concern for public safety by authorizing extensive regulation ... and by imposing a carefully constructed measure of liability should nuclear incidents occur.

*O'Conner*, 13 F.3d at 1096–97.

The parties do not dispute, and I also find, that the action alleged falls squarely within the definition of a PLA. The defendants contend, however, that all of plaintiffs' claims are preempted by the Act, such that the plaintiffs can only assert one single cause of action—the PLA. According to the defendants, the elements of this cause of action which plaintiff must allege are (1) that defendants breached their duty of care by permitting the decedent to be exposed to an amount of radiation in excess of the limits set forth in 10 C.F.R. § 20.101; and (2) that the exposure in excess of the limits set forth in 10 C.F.R. § 20.101 was the proximate cause of the injury alleged. Plaintiffs counter by arguing that the Act, as amended, (1) does not preempt the state law claims asserted against defendants; (2) the occupational dose limits set by 10 C.F.R. § 20.101 do not represent the sole duty that was owed Mr. Corcoran, because "all of the federal regulations concerning the nuclear industry provides [sic] a duty of care," including the "as low as reasonably achievable" ("ALARA") standard set forth in 10 C.F.R. § 20.1.

■ The mere fact that all causes of action arising out of a "nuclear incident" are federal in nature does not eliminate plaintiff's ability to assert claims the rules of decision of which are derived from state law. Indeed, as noted above, Section 2014(hh) explicitly provides that "the substantive rules for deci-

5. Section 2014(hh) "was designed to overturn decisions in which the Third Circuit had held that 'federal courts do not have subject matter jurisdiction for claims arising out of a non-ENO nuclear incident.'" *O'Conner*, 13 F.3d at 1096 (quoting S.Rep. No. 218 at 13 (citing *Stibitz v.*

*GPU*, 746 F.2d 993 (3d Cir.1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985)). *Accord TMI II*, 940 F.2d at 857 (the 1988 Amendments Act is "the clearest expression of intent that there be a federal cause of action arising directly under the Act").

sion ... shall be derived from" state law. Consequently, "only those theories of relief that are inconsistent with [the provisions of Section 2210] need be dismissed." *Bohrmann v. Maine Yankee Atomic Power Co.*, 926 F.Supp. 211, 218 (D.Me.1996); *accord James v. Southern California Edison Co.*, No. 94–1085–J (S.D.Cal. filed Dec. 13, 1994). That there is no monolithic PLA (as defendants vigorously argue) is clear from the Third Circuit's reasoning in *TMI II*:

> In explicitly providing that the "substantive rules for decision" in [PLAs] "shall be derived from" the law of the state in which the nuclear incident occurred, we believe that Congress expressed its intention that *state law provides the content of and operates as federal law....*
>
> ...
>
> ... [I]n *every case* alleging public liability, courts will be required to determine whether state law principles conflict with other parts of the Price–Anderson scheme.

*TMI II*, 940 F.2d at 855, 858 (emphasis supplied). The Court, therefore, will address each of plaintiffs' claims.

### 2. Plaintiffs' Claims

#### a. Negligence–Based Claims

■■■ The first cause of action against defendant NYPA is a wrongful death action alleging negligence on the part of the NYPA "in owning, operating, controlling, supervising, surveying, monitoring, maintaining and managing the possession and use of nuclear material at the" IP3 Nuclear Power Plant. As in any negligence action, the plaintiff must allege that the defendant violated its

duty of care. This Court adopts the reasoning of the Third and Seventh Circuits' decisions in *TMI II*, 940 F.2d at 858–59,[6] *TMI III*, 67 F.3d at 1113–15,[7] and *O'Conner*, 13 F.3d at 1105, which generally stand for the proposition that the appropriate standard of care must be dictated by federal law, including those federal safety regulations governing exposure to radiation. As the *O'Conner* Court reasoned, imposing any other standard of care would contravene the federal interest in occupying the field of nuclear safety, *see O'Conner*, 13 F.3d at 1105 ("the field of nuclear safety has been occupied by federal regulation"), and "disturb the carefully crafted balance between private involvement and safety that Congress has achieved." *Id.*

■■■ In addition, I also adopt that part of the reasoning in *TMI III* which rejected the ALARA standard as the appropriate duty of care:

> if jurors make the ALARA determination, then this "results, essentially, in a negligence standard." Adopting ALARA as part of the standard of care would put juries in charge of deciding the permissible levels of radiation exposure and, more generally, the adequacy of safety procedures at nuclear plants—issues that have explicitly been reserved to the federal government in general and the [Nuclear Regulatory Commission] specifically.
>
> Adoption of a standard as vague as ALARA would give no real guidance to operators and would allow juries to fix the standard case by case and plant by plant.... Our holding protects the public and provides owners and operators of nuclear power plants with a definitive stan-

---

6. "[T]he duty the defendants owe the plaintiffs in tort is dictated by federal law." *TMI II*, 940 F.2d at 858 (citing *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984); *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Development Comm'n*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)). *See also TMI III*, 67 F.3d at 1106 (in "[e]xamining the [1988] Amendments Act's 'federal components,' we found federal preemption of state tort law on the applicable standard of care").

7. Although *TMI III* specifically held that federal regulations governing exposure to radiation in "unrestricted" areas—namely, 10 C.F.R. §§ 20.105 and 20.106—provided the standard of

care, I find the reasoning underlying that opinion to apply with greater force with respect to exposure standards in "restricted" areas. A "restricted area" is defined in relevant part as "any area access to which is controlled by the licensee for purposes of protection of individuals from exposure to radiation and radioactive materials." 10 C.F.R. § 20.3(a)(14). The federal interest in regulating the exposure levels for individuals working in restricted areas appears greater than in unrestricted or "offsite" areas. At any rate, extending *TMI III*'s reasoning to restricted areas is consistent with that Court's holding, and I find none of the reasons for distinguishing *TMI III* proffered by plaintiffs persuasive.

dard by which their conduct will be measured.

*TMI III,* 67 F.3d at 1117 (quoting lower court) (citations omitted).

 Although the Second Amended Complaint for the most part makes vague allegations that the deceased was exposed to "dangerous," "excessive," or "life threatening" levels of radiation, it also alleges that the deceased plaintiff was "exposed to levels of radiation in excess of the regulations" and cites the applicable regulations governing occupational dose limits. Because I must read the complaint liberally, in light of the fact that the plaintiffs are proceeding *pro se,* I find that plaintiffs have alleged sufficient facts to support a claim that Mr. Corcoran was exposed to radiation in excess of the occupation dose limits set by the applicable federal regulations. Accordingly, the negligence claim will not be dismissed.[8]

### b. Intentional Torts [9]

 Consistent with the above, the Court is not persuaded that public liability claims based on intentional torts are *per se* preempted under the Act. At issue is whether the intentional tort alleged is inconsistent with Section 2210. *See* 42 U.S.C. § 2014(hh).

 Plaintiffs allege a barrage of intentionally tortious conduct against the NYPA and Westinghouse. According to plaintiffs, the NYPA and Westinghouse: (1) "failed to monitor the plaintiff ... to accurately determine his exposure to radiation"; (2) "knowingly permitted to exist and failed to correct business and industrial practices which subjected [the deceased] to dangerous levels of radiation"; (3) "failed to adequately and timely, [sic] make or cause to be made surveys to determine the extent of radiation hazards present in and around the area" where the deceased was assigned to work

prior to sending him there; (4) following discovery of the allegedly dangerous condition, "deliberately failed to immediately barricade the area and post radiation caution signs to warn and to prevent unsuspecting individuals, including [the deceased], from entering" and "intentionally assigned [the deceased] to work in and around the dangerously radioactive area without the benefit of equipment that would warn and/or protect him from the dangers present"; (5) knew that the deceased was unaware "that he had been exposed to levels of radiation in excess of the regulations" and that the deceased "believed defendants would advise him if there was a possibility that he had been exposed to excessive levels of radiation"; and (6) "knew with substantial certainty" of the gravity of the deceased plaintiff's exposure and the danger to his health arising therefrom, yet "deliberately concealed and intentionally failed to notify [the deceased] of his excessive exposure to radiation, and ... to provide him with medical monitoring, treatment or care."

 Many of these allegations sound in negligence, and are not properly pleaded as predicate facts constituting an intentional tort. Plaintiffs, however, plead sufficient facts that may state a claim for battery under New York law. In New York, "battery is 'an intentional wrongful physical contact with another person without consent.'" *Rivera v. Puerto Rican Home Attendants Servs., Inc.,* 930 F.Supp. 124, 132–33 (S.D.N.Y.1996) (Not Rep. in F.Supp.) (quoting *United Nat'l Ins. Co. v. Waterfront New York Realty Corp.,* 994 F.2d 105, 108 (2d Cir.1993)). If, as plaintiffs allege, the defendants knew of the dangerous condition and nonetheless intentionally assigned the deceased to work there with the intent that he become exposed to the radiation without his consent, then plaintiffs may have stated a

---

**8.** Because they are dependent on a breach of the standard of care, the Court will not dismiss plaintiffs' second and third causes of action, alleging negligence based on defendants' alleged "failure to warn" the deceased of the dangerous condition of the site where he worked, and accusing defendants of "negligent misrepresentation," respectively. Such claims will be construed as also alleging that the defendants breached their obligation to maintain exposure

levels within the acceptable dose limits set by federal regulations.

**9.** This claim encompasses the fourth cause of action of the Second Amended Complaint (against NYPA and WEDCO) as well as the first cause of action of the Amended Complaint against Westinghouse.

claim for battery. *See Rivera*, 930 F.Supp. at 131–32 (for battery, "the required intent is merely that the defendant intentionally made bodily contact and that the intended contact was itself offensive or without consent"). In order to make the claim consistent with the federal interest in regulating nuclear safety, however, this Court finds that plaintiffs' intentional tort claim must additionally plead a violation of the regulations governing occupational dose limits. Since plaintiffs have alleged that Mr. Corcoran was exposed "to levels of radiation in excess of the regulations," this PLA claim states a valid cause of action.

### c. Claims Alleging "Statutory Liability"

■ As a fifth cause of action against NYPA and a second cause of action against Westinghouse, the plaintiffs allege these defendants violated various statutes and regulations that

> include, but are not limited to, 18 U.S.C. 371 and 10 C.F.R. sections 20.1, 20.101, 20.103, 20.201, 20.202, 20.203, 20.401, 20.403, 20.405, 20.408, 20.409,[10] and section 223 of the Atomic Energy Act of 1954, as amended and set forth in the regulations under 10 C.F.R. section 20.602.

Plaintiffs claim the defendants "willfully violat[ed] the[se] statutes and regulations," which "proximately caused or contributed to" the deceased's "sustaining a radiation exposure which initiated or promoted his leukemia and ultimately caused his death." In their Memorandum of Law in opposition to the motion to dismiss, the plaintiffs elucidate their theory of liability under this cause of action. They do not assert a private right of action under these statutes;[11] rather, they look to these statutes and regulations as elements of a PLA.

No PLA can be based on these statutes or regulations, however, because the rules of decision for a PLA must be derived from state, not federal, law. *See* 42 U.S.C. § 2014(hh). Furthermore, although the plaintiffs argue more specifically that 18 U.S.C. § 371[12] and 10 C.F.R. § 20.602[13] im-

---

**10.** This Court, as the Third Circuit in *TMI III*, will consider only those regulations applicable at the time of the alleged nuclear incident. *See TMI III*, 67 F.3d at 1108 n. 10. In 1985, Section 20.1 stated, in relevant part, that the purpose of the regulations is

> to control the possession, use, and transfer of licensed material by any licensee in such a manner that the total dose to an individual ... does not exceed the standards of radiation protection prescribed in the regulations....
> ... [P]ersons engaged in activities under licenses issued by the [NRC] ... should, in addition to complying with the requirements set forth in this part, make every reasonable effort to maintain radiation exposures ... as low as is reasonably achievable. The term "as low as is reasonably achievable" means as low as is reasonably achievable taking into account the state of technology, and the economics of improvements in relation to benefits to the public health and safety, and other societal and socioeconomic considerations, and in relation to the utilization of atomic energy in the public interest.

10 C.F.R. § 20.1(b) and (c) (1985). Sections 20.101 and 20.103 set forth the standards for radiation exposure by individuals in "restricted areas." Section 20.201 obligates licensees to conduct surveys to ensure compliance with the regulations. Section 20.202 obligates licensees to provide certain personnel with monitoring equipment under certain express conditions. Section 20.203 regulates the manner of posting signs and controlling access to radiation areas, as well as labelling containers. Section 20.401 pertains to the licensee's obligation to maintain records of surveys and radiation monitoring. Sections 20.403 and 20.405 obligate licensees to notify and provide reports to the NRC of incidents involving radiation exposure. Section 20.408 requires the filing of reports of former employees' individual exposure incurred during the period of employment. Section 20.409 requires licensees to notify individuals who are exposed to radiation and for whom reports must be filed with the NRC under Sections 20.405 or 20.408.

**11.** Indeed, plaintiffs admit that the Atomic Energy Act "does *not* create a private right of action for parties who wish to themselves *regulate* or *enforce* NRC regulations."

**12.** Section 371 provides, in relevant part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C.A. § 371 (West Supp.1996).

**13.** 10 C.F.R. § 20.602 was enacted in November 1992 and expressly states which regulations apply (and do not apply) to 42 U.S.C. § 2273, which is the general provision outlining the pen-

pose a duty of care which defendants allegedly violated, I find that this "state" law claim directly violates both the letter and spirit of Section 2014(hh)'s command, for the duty of care thus imposed would necessarily depend on a federal rule of decision. To argue, as plaintiffs do, that a duty of care can be derived from all federal statutes or regulations would simply render Section 2014(hh)'s language a nullity. Indeed, it would allow private individuals to assume the role of the United States' Attorney General as the exclusive enforcer, by judicial action, of the Atomic Energy Act:

> *No action shall be brought* against any individual or person for any violation under this chapter unless and until the Attorney General of the United States has advised the Commission with respect to such action and no such action shall be commenced *except by the Attorney General of the United States. . . .*

42 U.S.C. § 2271 (emphasis supplied); *see also County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52, 59 (2d Cir.1984) (citing 42 U.S.C. § 2271 and affirming dismissal of complaint against power company "insofar as it seeks to enforce NRC-promulgated regulations"). Therefore, these causes of action must be dismissed.

### d. Conspiracy to Defraud Claim

Plaintiffs allege that NYPA and Westinghouse[14] "had knowledge that the [IP3] turbine stop valve upon which [the deceased] was assigned to work in June of 1985 had become dangerously contaminated with radiation," and that they "conspired together and maliciously and willfully entered into a scheme to conceal" this fact from the deceased, who "had been seriously exposed to excessive radiation," for the purpose of "defrauding and deceiving the Nuclear Regulatory Commission, the plaintiff, and others, so as to justify the viability of nuclear energy in

general, and the existence of [IP3], in particular."

Plaintiffs do not have standing to assert the NRC's (or anyone else's) rights against the defendants, assuming that such a conspiracy to defraud the NRC (or others) is in fact true. With respect to the alleged fraud perpetrated against the deceased, himself, the issue is whether such a state law claim is inconsistent with Section 2210. In New York, to state a cause of action for fraud based on fraudulent concealment the plaintiff must allege: (1) a material false representation or omission, (2) with the intent to defraud, (3) reasonable reliance, (4) damages, and (5) a duty to disclose. *See Palmer v. A & L Seamon, Inc.,* 1996 WL 153946, at *2 (S.D.N.Y. Apr. 2, 1996) (citing *Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1483 (2d Cir.1995); *Banque Arabe et Internationale v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995)). I do not find that a fraudulent concealment claim is inconsistent with provisions of Section 2210. *Cf. Bohrmann,* 926 F.Supp. at 219–20 ("The federal safety regulations do not immunize a defendant from liability for making fraudulent representations to persons either before or after subjecting them to radiation."). Unlike *Bohrmann,* however, I hold that no fraud can be perpetrated against the plaintiffs unless they demonstrate that the defendants violated the applicable regulations governing occupational dose limits. It would be inconsistent with the Act to allow the plaintiffs to state a claim of any kind that is premised on an exposure to radiation which a federal agency, in its expertise, has concluded is not unsafe. Because plaintiffs have in the amended complaints pled that Mr. Corcoran was exposed to levels of radiation in excess of the regulations, I reject defendants' contention that such fraud claim is preempted by the Act.[15]

---

alties for violations of the Atomic Energy Act and its regulations.

**14.** This cause of action encompasses the sixth claim of the Second Amended Complaint and the third claim of the Amended Complaint against Westinghouse.

**15.** The Court, of course, has not ruled on the motion for summary judgment on the notice of

claim issue, which will be fully submitted to this Court in several months. It may be, as defendants argue, that because the plaintiffs failed to timely file a notice of claim against NYPA, the Estate cannot recover against the NYPA under any cause of action for its damages arising from the wrongful death of the deceased.

**390**

### e. Survival Claim

 Carrie also brings a survival action [16] on behalf of her father seeking to recover damages for the injuries he suffered prior to his death.[17] Since "[a] survival action, after all, is essentially a decedent's personal injury lawsuit," *In re Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831, 851 (2d Cir.1992), this cause of action is dependent on the viability of the aforementioned causes of action.

### 3. Liability of Westinghouse as Contractor

 Westinghouse argues that because the Act "channels" all public liability to the licensee (NYPA in this instance), "[e]ven if Plaintiffs were to reassert their claims against Westinghouse in a properly drafted PLA, the claims against Westinghouse should be dismissed because Westinghouse would not be a proper party."[18] Westinghouse cites a single, two-page Memorandum Opinion in support of this proposition. *See Grimes v. Baltimore Gas & Elec. Co.,* No. 95–1042, 1995 WL 901885 (D.Md. Nov. 8, 1995) (dismissing claims against non-licensee defendants) (citing *O'Conner v. Commonwealth Edison Co.,* 807 F.Supp. 1376, 1378 (C.D.Ill.1992), *aff'd,* 13 F.3d 1090, (7th Cir.) *cert. denied,* —— U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994) (citations omitted)).

 An important feature of the Act, it is true, is its "channeling of liability" provision, under which "any entity exposed to potential liability for activity resulting in a nuclear incident, even if it were not a direct participant in the activity, was entitled to indemnification." *TMI II,* 940 F.2d at 852 (citing S.Rep. No. 218, 100th Cong., 2d Sess., *re-*

*printed in* 1988 U.S.C.C.A.N. 1476, 1477).[19] The *O'Conner* District Court explained:

In passing the Price–Anderson Act, Congress recognized that a nuclear incident might be caused by any number of participants in the nuclear industry beyond the actual licensee. Congress did not want quick and fair compensation to be hampered by the complications likely to ensue if multiple defendants, each with its own law firm, were actively and separately defending. In a "significant departure from normal tort law precepts," Congress, through mandatory indemnification provisions, channelled all public liability to licensees, and away from non-licensees, (such as contractors ...), who might otherwise have borne such liability under ordinary tort law.... The channelling provisions alter the ordinary congruence in tort law between causing and bearing liability. Consequently, contractor London Nuclear Services cannot *separately* be liable to plaintiff in any manner in this case.

*O'Conner,* 807 F.Supp. at 1378 (citations omitted) (emphasis supplied). This Court finds Westinghouse's argument unpersuasive for two reasons. First, as the above quote makes clear, the contractor (London Nuclear Services) was not dismissed from the case; in fact, the contractor had remained a party throughout the litigation. *See O'Conner,* 13 F.3d 1090; *O'Conner v. Commonwealth Edison Co.,* 748 F.Supp. 672 (C.D.Ill.1990). Therefore, the District Court's decision in *Grimes* is also unpersuasive. Second, it is incongruous to argue that contractors cannot be subject to suit simply because they may be indemnified. After all, with respect to ENOs, a waiver of defenses may be required by the NRC, and yet the contractor remains a properly named defendant in such an ac-

**16.** *See* N.Y. Est. Powers & Trusts Law § 11–3.2(b) (McKinney Supp.1996) ("No cause of action for injury to person or property is lost because of the death of the person in whose favor the cause of action existed.")

**17.** This cause of action is the seventh claim of the Second Amended Complaint and the fourth claim of the Amended Complaint.

**18.** It should be noted that Westinghouse in its reply motion shifted grounds with respect to its liability under the Act. In the motion to dismiss,

Westinghouse merely argued that all claims against it also should fall under the rubric of a PLA and preempt any state law claims.

**19.** 42 U.S.C. § 2014(t) defines "person indemnified", with respect to a nuclear incident occurring within the United States, as "the person with whom an indemnity agreement is executed or who is required to maintain financial protection, and *any other person* who may be liable for public liability." (Emphasis supplied.)

tion. *See* 42 U.S.C. § 2210(n)(1).[20] There-
fore, this action will not be dismissed against
Westinghouse.

**B. WEDCO**

 WEDCO moves to be dismissed
from the case pursuant to Rules 12(b)(4) and
(5), Fed.R.Civ.P., for plaintiffs' failure to ef-
fect proper service; pursuant to Rule
12(b)(6), Fed.R.Civ.P., because although
WEDCO remains nominally in the case as a
party named in the caption, no claims are
asserted against WEDCO in the Second
Amended Complaint; and because WEDCO
is a dissolved corporation without capacity to
be sued.

 Since plaintiffs have alleged no
claims against WEDCO in the Second
Amended Complaint, there is no theory of
liability with respect to WEDCO and, there-
fore, no claim upon which relief can be grant-
ed. Furthermore, WEDCO lacks capacity to
be sued. "The capacity of a corporation to
sue or be sued shall be determined by the
law under which it was organized." Rule
17(b), Fed.R.Civ.P. It is uncontested that
WEDCO was a Delaware corporation and
was dissolved on May 2, 1978. In Delaware,

> All corporations, whether they expire by
> their own limitation or are otherwise dis-
> solved, shall nevertheless be continued, for
> the term of 3 years from such expiration or
> dissolution or for such longer period as the
> Court of Chancery shall in its discretion
> direct, bodies corporate for the purpose of
> ... defending suits ... against them....

Del.Code Ann. tit. 8, § 278 (1991). Plaintiffs
commenced their action in state court in
March 1995, more than seventeen years after
WEDCO's dissolution. Furthermore, the
Delaware Chancery Court's power to extend

the three-year window must be exercised
within such three-year window. *See In re
Citadel Indus., Inc.,* 423 A.2d 500, 503 (Del.
Ch.1980); *see also United States v. Mc-
Donald & Eide, Inc.,* 670 F.Supp. 1226, 1230
(D.Del.1987) (citing *Citadel* ), *aff'd,* 865 F.2d
73 (3d Cir.1989). Thus, once the corporation
has dissolved and the three-year window has
closed, it cannot be reopened under Section
278; only Section 279, Del.Code Ann. tit. 8,
§ 279, is applicable. *See Citadel,* 423 A.2d at
504; *McDonald & Eide,* 670 F.Supp. at 1230
("Section 279 was intended to apply in situa-
tions where the three-year period has al-
ready expired...."). Section 279 states in
relevant part:

> When any corporation organized under
> this chapter shall be dissolved in any man-
> ner whatever, the Court of Chancery, on
> application of any creditor, stockholder or
> director of the corporation, or any other
> person who shows good cause therefor, at
> any time, may appoint 1 or more of the
> directors of the corporation to be trustees,
> or appoint one or more persons to be
> receivers, of and for the corporation, to
> take charge of the corporation's property,
> and to collect the debts and property due
> and belonging to the corporation, with
> power to prosecute and defend, in the
> name of the corporation, or otherwise, all
> such suits as may be necessary or proper
> for the purposes aforesaid ... and *to do
> all other acts which might be done by the
> corporation,* if in being, *that may be neces-
> sary for the final settlement of the unfin-
> ished business of the corporation.* The
> powers of the trustees or receivers may be
> continued as long as the Court of Chan-
> cery shall think necessary for the purposes
> aforesaid.

---

**20.** That Section reads, in relevant part:

> With respect to any [ENO] to which an in-
> surance policy or contract furnished as proof
> of financial protection or an indemnity agree-
> ment applies and which [arises out of certain
> enumerated events] ... the Commission or the
> Secretary, as appropriate, may incorporate
> provisions in indemnity agreements with licen-
> sees *and contractors* under this section, and
> may require provisions to be incorporated in
> insurance policies or contracts furnished as
> proof of financial protection, which waive (i)
> any issue or defense as to conduct of the claim-

> ant or fault of persons indemnified, (ii) any
> issue or defense as to charitable or governmen-
> tal immunity, and (iii) any issue or defense
> based on any statute of limitations if suit is
> instituted within three years from the date on
> which the claimant first knew, or reasonably
> could have known, of his injury or damage and
> the cause thereof. The waiver of any such
> issue or defense shall be effective regardless of
> whether such issue or defense may otherwise
> be deemed jurisdictional or relating to an ele-
> ment in the cause of action....
> 42 U.S.C. § 2210(n)(1) (emphasis supplied).

Del.Code Ann. tit. 8, § 279 (1991) (emphasis supplied). The language of Section 279

> implies that its primary purpose is to safeguard the collection and administration of still existing property interests of a dissolved corporation.... Where there are *no undistributed assets against which to effect a recovery,* § 279 provides little solace to one possessing an after-discovered claim against a dissolved corporation.

*Citadel,* 423 A.2d at 506.

Because it is undisputed that no judicial extension of the three-year period under Section 278 has been effected, and all of WEDCO's assets were distributed as of 1978, WEDCO cannot be continued as a corporation subject to suit pursuant to Section 279. Accordingly, WEDCO must be dismissed as a defendant. *See Gonzalez v. Progressive Tool & Die Co.,* 455 F.Supp. 363, 365 (E.D.N.Y.1978) (applying Massachusetts law); *Sevits v. McKiernan–Terry Corp.,* 264 F.Supp. 810, 811–12 (S.D.N.Y.1966) (applying Delaware law).

## C. Plaintiffs' Motion To Substitute Westinghouse for WEDCO

 Plaintiffs in their memorandum of law opposing the motion to dismiss, "request leave of Court to further amend the complaint in [the NYPA action], by interlineation of the caption, substituting" Westinghouse for WEDCO.[21] Plaintiffs rely on Rule 15(c), Fed.R.Civ.P., which provides, in relevant part:

> An Amendment of a pleading relates back to the date of the original pleading when
>
> (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
>
> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth

or attempted to be set forth in the original pleading, or

> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining *a defense on the merits,* and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Rule 15(c), Fed.R.Civ.P. Rule 15(c) thus requires that each of the following requirements be met: (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, but for a mistake of identity, the original action would have been brought against it; and (4) the second and third criteria are fulfilled within 120 days of the filing of the original complaint, and the original complaint was filed within the limitations period. *See Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 468–69 (2d Cir.1995).

The claims against Westinghouse that plaintiffs argue should relate back to the filing of the original complaint are (1) various "intentional torts," which the Court above concluded may state a claim for battery; (2) "statutory liability"; and (3) "conspiracy to defraud." The statutory liability claim is dismissed, and, therefore, cannot relate back. Looking at the conduct set forth in the original complaint, the various claims asserted against WEDCO were related to WEDCO's alleged role in the design and construction of the equipment that plaintiffs' contend caused

---

**21.** Defendants understandably complain that plaintiffs' application is procedurally defective, since it appears in their memorandum of law and is not brought by motion, pursuant to Rule 7(b), Fed.R.Civ.P. ("An application to the court for an order shall be by motion"), and Local Civil Rule 3. Defendants, however, have had notice of this request since September 27, 1995, when plaintiffs filed a "reply" in opposition to defendants' first Rule 12 motion. Defendants also filed a memorandum of law on March 6, 1996, in opposition to plaintiffs' application. Since the issue has been fully briefed by all parties, the Court, in its discretion, will decide plaintiffs' application on the merits.

the deceased's exposure to radiation. Thus, "the tortious conduct complained of" in the original complaint—negligent or defective design or construction of equipment at IP3—occurred before WEDCO's dissolution in May 1978, and, *a fortiori*, before any of the conduct presently alleged in the Amended Westinghouse Complaint as constituting intentional torts or conspiracy to defraud on the part of Westinghouse.[22] Relation back is, therefore, inappropriate because " ' "the general fact situation alleged in the original pleading" ' " cannot be said to have given " 'adequate notice of the matters raised in the amended pleading.' " *Kitrosser v. CIT Group/Factoring, Inc.*, 1995 WL 567115, *3 (S.D.N.Y. Sept. 25, 1995) (Cote, J.) (quoting *In re Chaus Secs. Litig.*, 801 F.Supp. 1257, 1264 (S.D.N.Y.1992) (quoting *Contemporary Mission, Inc. v. New York Times Co.*, 665 F.Supp. 248, 255 (S.D.N.Y.1987), *aff'd*, 842 F.2d 612 (2d Cir.), *cert. denied sub nom. O'Reilly v. New York Times Co.*, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988))).

Moreover, it is clear that plaintiffs were not mistaken about Westinghouse's identity. *See Barrow*, 66 F.3d at 469 (Rule 15(c)'s requirement that defendant knew it was not named due to a mistake concerning identity " 'presupposes that in fact the reason for [its] not being named was a mistake in identity' ") (quoting *Cornwell v. Robinson*, 23 F.3d 694, 705 (2d Cir.1994)). Plaintiffs were well aware of Westinghouse's status as the deceased's employer at the time the original complaint was filed.[23] Plaintiffs also knew that WEDCO was the entity "involved in the general design of the systems and equipment in [IP3]." That plaintiffs chose to state claims of negligent or defective design and strict liability against WEDCO makes clear, beyond peradventure, that this is not a case of mistaken identity.[24]

---

22. Thus plaintiffs wrote: "On information and belief, WEDCO ... dissolved on or about May 18, 1979, *after* the tortious conduct complained of herein." (Emphasis supplied.)

23. Thus, the original complaint states that Mr. Corcoran "performed this work under a contract or other agreement for services between NYPA and his employer, Westinghouse...."

24. Rule 15(c)(1), Fed.R.Civ.P., is of no assistance to plaintiffs, assuming that in a PLA the forum

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is denied in all respects, except that the fifth cause of action of the Second Amended Complaint and the second cause of action of the Amended Westinghouse Complaint, and all claims against WEDCO are hereby dismissed with prejudice. The plaintiffs' motion to substitute Westinghouse for WEDCO in the NYPA action is denied.

SO ORDERED:

state's statute of limitations applies, because the "New York and Federal Rules regarding relation back are similar, and courts in the Second Circuit have not distinguished the two." *Morse/Diesel Inc. v. Fidelity and Deposit Co. of Maryland*, 1995 WL 358627, at *10 n. 5 (S.D.N.Y. June 15, 1995) (Cote, J.) (citing, *inter alia, The Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 125 (2d Cir.1994)).