Robert **KESECKER, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF ENERGY, N.L. Industries, Inc., NLO, Inc., Defendants.**

**Civ. No. C–1–86–1236.**

United States District Court, S.D. Ohio, W.D.

Jan. 28, 1988.

Michael Hall, Dayton, Ohio, for plaintiffs.

John Wirthlin, Donetta Wiethe, Asst. U.S. Atty., Cincinnati, Ohio, Rupert Mitsch, Washington, D.C., for defendants.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

CARL B. RUBIN, Chief Judge.

This matter is before the Court following trial held December 8, 9 and 10, 1987 with presentation of evidence and testimony. Plaintiff seeks relief for an asserted injury incurred while in the employ of NLO, Inc., in facilities owned by the United States of America and leased to NLO, Inc. In accordance with Rule 52 of the Federal Rules of Civil Procedure the Court does submit herewith its Findings of Fact, Opinion and Conclusions of Law.

1. Even though ownership was separated from operation, safety standards established by the United States were enforced at the plant by

I.

## FINDINGS OF FACT

1. Plaintiff Robert E. Kesecker was employed from January 23, 1956 through October 18, 1965 at a uranium processing plant owned by defendant United States of America and operated by NLO, Inc. ("NLO")[1]. NLO was a complying employer under Ohio Workers Compensation laws during plaintiff's period of employment. In his employment plaintiff dealt with uranium and was required to machine "cores" of uranium to remove surface imperfections. (Defendant's Ex. 434). In his employment plaintiff was exposed to some radiation emanating from uranium dust and uranium particles caused by the machining process.

2. The operation of the plant in question was governed by safety regulations which included the following:

A. All employees were prohibited from wearing street clothes into the plant but were instead required to wear clothing issued by defendants. Employees were issued fresh clothing both in the morning upon arrival and after their lunch break. In each instance they were required to shower before leaving the plant and to discard all clothing previously worn.

B. All employees were required to wear an identifying badge which included a film strip indicating the amount of exposure to radiation.

C. All employees were required to submit urine samples and to undergo periodic physical examinations.

D. The defendant NLO established standards of radiation exposure more restrictive than those established by the Atomic Energy Commission (AEC) and required that the plant at all times conform to such restrictions.

E. An extensive duct and ventilation system was established to remove wherever practical particles and dust from the

onsight inspection and by periodic safety review.

air that might be radioactive. (See Defendant's Ex. 434.)

3. Plaintiff Kesecker has had physical health problems during his entire adult life. In October, 1955, when he first applied for employment he was put in "Class C". He was deemed satisfactory for the position for which he was considered, but a specific restriction was placed upon his transfer to certain other positions. (Plaintiff's Ex. 112) At about the same time plaintiff had been rejected for a position "production mechanical" with the following language: "Did not meet physical requirements of position for which hired." (Plaintiff's Ex. 111) Neither counsel nor any witness indicated the specific reason for such rejection.

4. Plaintiff has been treated by the following physicians who are listed in chronological order.

1. Dr. George Rourke
2. Dr. Peter Enyeart
3. Dr. Donald Pulver
4. Dr. R. Michael Kelly
5. Dr. Robert McQueen
6. Dr. W. Giles Allen

The following observations are contained in the medical records submitted to the Court[2].

A. Dr. Rourke on October 15, 1973 "Asthma, cough, wheezing, no fever (illegible word), 15–20 years ago with weather changes."[3] (Joint Ex. 1, Tab Lebanon Medical Group Dr. Rourke, page 00006)

B. Dr. Peter Enyeart noted on September 27, 1983: "History bronchial asthma years ago in West Virginia." (Joint Ex. 1, Tab "Dr. Enyeart", page 00011)

C. Dr. Donald W. Pulver on May 25, 1984: "... Robert Kesecker, a fifty-two year old male with a four year history of bronchial asthma ... Final diagnoses: bronchial asthma—Intrinsic and Extrinsic, Perennial Allergic Rhinitis." (Joint Ex. 1, Tab "Dr. Enyeart", page 00007)

Dr. Enyeart relied upon a chest x-ray by Dr. Susan Weinberg of the Bethesda Hospital Radiology Services made on December 12, 1983. Her findings: "P.A. and lateral chest. The cardiopericardial silhoette is normal in size and configuration. The lungs are clear. The soft tissues and bones are unremarkable. Impression: Normal chest." (Joint Ex. 1, Tab "Dr. Enyeart", page 00010)

D. Dr. W. Giles Allen on July 16, 1987 made the following comments: "Chest x-ray: Prominent peribronchial markings bilaterally but no interstitial changes ... Impression (1) Asthma, poorly controlled, but well tolerated ... (3) History of uranium exposure in alleged toxic doses...." (Joint Ex. 1, Tab "Dr. Allen", page 00001)[4].

5. Two medical experts were presented to the Court. Dr. Michael Kelly, an internist in occupational medicine diagnosed the plaintiff's condition as interstitial fibrosis[5].

Defendants' expert witness was Dr. Robert P. Baughman who is board certified in internal medicine and board certified in internal medicine—pulmonary. Dr. Baughman testified that in his opinion it was a 90% medical certainty that the plaintiff has asthma and that it was less than a 5% medical certainty that the plaintiff has pulmonary fibrosis.

---

**2.** The parties have submitted Joint Exhibit 1 which is a large volume containing tabs with pages numbered separately under each tab. References in this Finding of Fact refer to such exhibit and the identifying tab being used.

**3.** On cross-examination of plaintiff Kesecker, defense counsel asserted that the missing word was "history" without any objection either by plaintiff or plaintiff's counsel.

**4.** The foregoing are not considered by the Court as additional expert opinions. They are condensations only of documents presented and admitted into evidence as factual evidence of plaintiff's physical condition.

**5.** Dr. Kelly qualifies as an expert under Rule 702 of the Federal Rules of Evidence. Information supplied to the Court in Appendix E–6 of the final pretrial order contained the following language as to Dr. Kelly: "Board certified in the specialty of internal medicine and board certified in specialty." His expertise must be qualified by a lack of board certification as a pulmonologist.

The totality of evidence presented to the Court indicates that only was Dr. Kelly made a diagnosis of pulmonary fibrosis.

6. As noted in Finding 2D, the safety standards imposed at the plant in question were substantially above the requirements imposed by the AEC. The plant itself was operated in a conservative fashion and safety restrictions imposed upon employees were substantially above those accepted in other similar plants. In the nine years of employment by plaintiff his skin exposure in terms of "rem"[6] varied from a low of 2.4 rems per year to a high of 5.3 rems per year. During this entire period the AEC limit for annual exposure was 30 rem. With the exception of 1959 when the exposure was 5.3 and 1960 when the exposure was 5.1, plaintiff's annual exposure never exceeded 3.9. (Defendant's Ex. 407)

7. The external radiation exposure for plaintiff in his whole body never exceeded 1.5 rem while the AEC standard limit of exposure was 15 rem in the years 1955, 1956 and 1957; 12 rem in the years 1958 and 1959; and 5 rem in all years thereafter. With the exception of the years 1963 when the exposure was 1.5 and 1964 when the exposure was 1.1, plaintiff's exposure never exceeded 0.7. (Defendant's Ex. 408)

The foregoing establishes that at no time was plaintiff exposed to a hazardous quantity of radiation.

## II.

## OPINION

The Court confronts in this case a question that is of brought on by exposure to potentially dangerous substances. The illness of "black lung" (pneumoconiosis) among coal miners and "asbestosis" among asbestos workers are specific examples. Dealing appropriately with this problem must impact upon the overall relationship of employer and employee irrespective of industry. In essence the inquiry must be this: May a court reward an employee who deals with a hazardous product simply because of his exposure or must there be a showing of actual injury? Plaintiff herein has been exposed but he has not been injured.

There is in addition a separate inquiry as to liability of the United States and the liability of N.L. Industries, Inc. and NLO, Inc.

### A. *Liability of the United States*

Liability of the defendant United States of America Department of Energy is limited to the Federal Tort Claim Act, 28 U.S.C. § 2671 *et seq.* The significant section thereof is § 2674 which provides in part: "The United States shall be liable respecting the provisions of this title relating to tort claims in the same manner and to the same extent as a private individual under like circumstances...."

It is not entirely clear who the "private individual" is. The United States is both an owner of real estate and a safety regulator. A landlord out of possession is not liable for the torts of a tenant in which such landlord does not participate.

As a regulator the United States acting through the Department of Energy and its predecessor Atomic Energy Commission established standards of maximum exposure that were not even approached. (See Findings of Fact 6 and 7) Indeed, plaintiff has never asserted violation of AEC standards.

If some assertion of vicarious liability be asserted it cannot rise above the liability of the employer.

### B. *Liability of Defendants N.L. Industries, Inc. and NLO, Inc.*

These defendants are employers and their liability can only be established by the laws of the State of Ohio.

"It has been the law of Ohio for over seventy years that the system of workers compensation is the exclusive remedy for industrial injury ..." The Ohio Workers' Compensation Commission was "intended to remove from the common law tort sys-

---

6. The unit of biologically effective dose for humans is the "rem". The origin of the term is "Roentgen-Equivalent-Man." The rem is the absorbed dose (rad) multiplied by the quality factor (QF). (Plaintiff's Ex. 121, page 0044).

tem all disputes between or among employers and employees regarding the compensation to be received for injury or death to an employee ..." (Ohio Revised Code § 4121.80(B)).

In addition, Ohio Revised Code § 4121.80 refers to an intentional tort claim and imposes a burden upon a plaintiff to establish an intentional tort which gives rise under Ohio law to additional compensation[7]. Section 4121.80 of the Ohio Revised Code is instructive in that it defines certain terms which are important to any consideration of this matter. The term "intentional tort" is defined as "an act committed with the intent to injure another or committed with the belief that the injury is substantially certain to occur."

"Substantially certain" means that an employer acts with deliberate intent to cause an employee to suffer injury, disease, condition or death". *Id.*

Only one expert witness addressed the question of intentional tort. Dr. Eugene Saenger, Professor Emeritus of Radiology at the University of Cincinnati and board certified in Radiology and Nuclear Medicine observed: "[The manner in which the plant was operated] was substantially likely *not to cause injury.*" (TR., pg. 59) (emphasis added)

The only remaining assertion of plaintiff is that the defendants failed to warn him of the dangers of his occupation.

There can be no question that plaintiff during his entire employment was constantly aware that he was dealing with conditions different from those that he had ever experienced before or would ever experience again. He was required to change his clothing twice each day. He was required to shower twice each day. He was required to wear a badge showing radiation exposure. He was required to submit to frequent urinary examinations and he was required to submit to physical examinations.

While admittedly uranium is radioactive, the testimony before the Court was quite instructive as to the nature of the danger. According to Dr. Saenger, the only expert presented to the Court on this subject, had the plaintiff been exposed to five rems per year his risk would have only been one to two percent greater than that accepted by all members of our society. (TR. pg. 41–18) The evidence presented convincingly establishes that plaintiff does not have any exposure related illness. While it is arguable that the results of plaintiff's inhalation of uranium might not appear for a prolonged period of time, it is equally arguable that the longer such period continues the greater likelihood there is of exposure to some other cause of cancer. In an industrial society there are carcinogens in the food we eat, the water we drink and the air we breathe. Even twenty years after the last date of exposure, plaintiff does not suffer from a condition resulting from his employment. In examining the expert testimony and the factual predicate to that testimony, there is far greater weight to the conclusion that plaintiff suffers from asthma from which he has likewise suffered off and on during much of his life than that his asthma condition was caused by any exposure to uranium.

In view of the foregoing the Court determines that the plaintiff has not shown by a preponderance of the evidence any liability of the United States pursuant to the Federal Tort Claim Act or any liability of his former employer pursuant to § 4121.80 Ohio Revised Code.

### III.

### CONCLUSIONS OF LAW

A. This Court has jurisdiction pursuant to the Federal Tort Claim Act, 28 U.S.C. § 2671, 28 U.S.C. § 1331 and 28 U.S.C. § 1332 and the pendant and ancillary jurisdiction of the Court.

B. Liability under the Federal Tort Claims Act is determined by ascertaining

---

7. The Court notes without comment Ohio Revised Code § 4121.80(A) which provides in part: "In no event shall any action be brought pursuant to this section more than two years after the occurrence of the act constituting the alleged intentional tort." The employment of plaintiff ceased over twenty years prior to the commencement of suit.

whether a private person would be responsible for similar acts under the laws of the state where the acts occurred. 28 U.S.C. § 2674; *Rayonier, Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957).

C. In an action brought by an employee against his employer pursuant to the Ohio Workers' Compensation laws, the Court is limited to a determination of whether or not the employer committed an intentional tort. Ohio Revised Code § 4121.80(D).

D. The evidence herein demonstrates that no intentional tort was committed.

E. In accordance with Conclusions of Law B, C and D, Plaintiff's complaint is hereby dismissed at plaintiff's costs.

IT IS SO ORDERED.