Owen McCAFFERTY, et al., Plaintiffs,

v.

CENTERIOR SERVICE COMPANY, et al., Defendants.

No. 1:95–CV–1732.

United States District Court, N.D. Ohio, Eastern Division.

Oct. 9, 1997.

Steven D. Bell, Ulmer & Berne, Cleveland, OH, for Plaintiffs.

Robin G. Weaver, Paula Beth Christ, Squire, Sanders & Dempsey, Cleveland, OH, Donald E. Jose, David Wiedis, Jose & Wiedis, Westchester, PA, for Defendants.

## MEMORANDUM OPINION AND ORDER

NUGENT, District Judge.

This matter comes before the Court upon the Report and Recommendation of a Magistrate Judge of this Court submitted on June 19, 1997 (Document # 49) regarding Plaintiffs' Motion for Partial Summary Judgment (Document # 30) and Defendants' Cross–Motion for Summary Judgment (Document # 35). The named Report is hereby ADOPTED in part and NOT ADOPTED in part.

On August 7, 1995, Plaintiffs, insulating contractors, filed a Complaint in this Court alleging injury from exposure to radiation while removing insulation at the Davis–Besse Nuclear Power Station in October of 1994. Defendants Centerior Service Company ("Centerior") and Toledo Edison Company ("Toledo") are jointly licensed to operate the Plant by the Nuclear Regulatory Commission ("NRC").

Plaintiffs brought this action as a public liability action under the Price–Anderson Act, 42 U.S.C. § 2210, as amended, asserting state tort theories of negligence, strict liability, intentional infliction of emotional distress, reckless and wanton misconduct, negligent infliction of emotional distress, and negligent infliction of severe and debilitating emotional distress. Plaintiffs also included a claim for medical monitoring.

In March 1997, the matter was referred to Magistrate Judge David S. Perelman for a Report and Recommendation on the parties' cross-motions for summary judgment. On June 19, 1997, the Magistrate Judge issued a Report and Recommendation. The Magistrate Judge recommended that Plaintiffs' Motion for Partial Summary Judgment be denied and that Defendants' Cross–Motion for Summary Judgment be granted. Relying on the language of 42 U.S.C. § 2014(hh) and relevant case law, the Magistrate Judge concluded that state law causes of action for injuries relating to nuclear incidents are preempted by the Price–Anderson Act, but that the elements of the state law causes of action, to the extent they are consistent with federal law, represent the elements of a public liability action. With respect to the negligence and reckless and wanton misconduct claims, the Magistrate Judge found that the standard of care applicable to Defendants is set by the numerical occupational dose limits contained in 10 C.F.R. § 20.1201, rather than the requirement in 10 C.F.R. § 20.1101 that licensees employ "procedures and engineering controls" designed "to achieve occupational doses and doses to members of the public that are *as low as is reasonably achievable (ALARA)."* [1] 10 C.F.R. § 20.1101

1. The parties agreed that federal law would govern the standard of care element in this public

liability action.

(emphasis added). Because the amount of radiation to which Plaintiffs were exposed was less than the numerical occupational dose limits contained in 10 C.F.R. § 20.1201, the Magistrate Judge ruled that Defendants did not breach their duty of care as a matter of law. With respect to the emotional distress claims, the Magistrate Judge found that these claims failed because Plaintiffs did not present sufficient evidence supporting. the requisite level of emotional distress. Finally, the Magistrate Judge deemed waived Plaintiffs' strict liability claim, and held that Plaintiffs' claim for medical monitoring failed as it was dependent on the substantive causes of action.

Plaintiffs filed objections to the Report on June 26, 1997, and Defendants filed objections on July 1, 1997. Plaintiffs argue that the Magistrate Judge erred by: (1) failing to consider an alternative standard of care proposed by Plaintiffs; (2) failing to properly apply the elements of the emotional distress claims; and, (3) improperly weighing the evidence presented by both sides as to the Plaintiffs' reasonable fear of contracting cancer. For their part, Defendants challenge the Magistrate Judge's characterization of Defendants' legal argument as "disingenuous" (Report at 12) and argue that the Magistrate Judge's analysis, while reaching the correct result, was incomplete.

The Report and Recommendation of the Magistrate Judge, along with the objections of Plaintiffs and Defendants, are herein reviewed by this Court.

## Standard of Review for Magistrate Judge's Report and Recommendation

The applicable district court standard of review for a magistrate judge's report and recommendation depends upon whether objections were made to that report. When objections are made to a report and recommendation of a magistrate judge, the district court reviews the case *de novo*. FED. R.CIV.P. 72(b) provides this standard of review; it states, in pertinent part, that:

[t]he district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

Accordingly, this Court will review the Report and Recommendation, to which timely objections have been filed, *de novo. See Massey v. City of Ferndale*, 7 F.3d 506 (6th Cir.1993).

## Conclusion

The Court has reviewed the Report and Recommendation of the instant case *de novo. See Massey*, 7 F.3d 506. The Court has also considered all of the pleadings, motions and filings of the parties. After careful evaluation of the record, the Report and Recommendation, Defendants' Objections, and Plaintiffs' Objections, the Court is not in complete agreement with some of the conclusions reached by the Magistrate Judge.

█ A public liability action allows recovery for damages resulting from a "nuclear incident."[2] Section 2014(hh) of the Price–Anderson Act specifically provides that the "substantive rules for decision in such [public liability] action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of [section 2210, titled "Indemnification and limitation of liability"]." 42 U.S.C. § 2014(hh). The Court finds that Magistrate Judge Perelman correctly determined that the elements of state law, to the extent they are consistent with section 2210, form the public liability cause of action.

█ The Court's point of departure, however, is with the determination that the occupational dose limits contained in 10

---

**2.** A "nuclear incident" is defined in the Price–Anderson Act as "any occurrence * * * within the United States causing[ ] * * * bodily injury, sickness, disease, or death[ ] * * * arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q).

C.F.R. § 20.1201 represent the only relevant standard of care for the negligence claims in this public liability action. The parties and the Magistrate Judge correctly recognized that federal law provides the applicable standard of care for Defendants in this case, since nuclear safety is controlled by federal regulation and a state standard regulating radiation exposure would thus be inconsistent with specific federal regulations. *See In re TMI,* 67 F.3d 1103, 1106–07 (3 rd Cir.1995) ("federal law determines the standard of care and preempts state tort law") (citing *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1105 (7 th Cir.), *cert. denied,* 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994)), *cert. denied,* —— U.S. ——, 116 S.Ct. 1034, 134 L.Ed.2d 111 (1996).

Relying on ALARA's characterization by the NRC as a flexible operational principle and Congress' intent that federal law govern nuclear safety, the Magistrate Judge concluded that ALARA did not provide the requisite standard of care. This conclusion is not without support. In *In re TMI,* the Third Circuit recently declined to use the ALARA regulation contained in 10 C.F.R. § 50.34a(a) as a standard of care in public liability actions, primarily because the regulation itself states that the guidelines set forth in an Appendix to Part 50 regarding the ALARA regulations " 'are not to be construed as radiation protection standards.' " *In re TMI,* 67 F.3d at 1114 (quoting 10 C.F.R. § 50.34a(a)). The Third Circuit also relied on comments in the Federal Register made over 20 years ago indicating that the standards *in Part 20* continued to provide protection to public health. It also reasoned that "[a]dopting ALARA as part of the standard of care would put juries in charge of deciding the permissible levels of radiation exposure and, more generally, the adequacy of safety procedures at nuclear plants—issues that have explicitly been reserved to the federal government in general and the NRC specifically." 67 F.3d at 1115 (citing *Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 212, 103 S.Ct. 1713, 1726, 75 L.Ed.2d 752 (1983)).

As the Magistrate Judge recognized, however, the ALARA regulation interpreted in *In re TMI* was amended in 1991, and the Third Circuit's opinion concerns the pre–1991 regulation. The regulation interpreted by the Third Circuit was (and still is) contained in Part 50, which deals with licensing of production and utilization facilities. The 1991 amendment, however, inserted the ALARA principle into Part 20, which is labeled "Standards for Protection Against Radiation." Part 20 also contains the numerical occupational dose limits relied upon by the Magistrate Judge as setting the applicable standard of care in this case. The ALARA regulation in Part 20 appears in newly created subpart B, labeled "Radiation Protection Programs" and provides that "[t]he licensee shall use, to the extent practicable, procedures and engineering controls based upon sound radiation protection principles to achieve *occupational doses* and doses to members of the public that are *as low as is reasonably achievable (ALARA)."* 10 C.F.R. § 20.1101(b) (emphasis added).

Without the 1991 amendment, the Court would be in agreement with the Magistrate Judge's conclusion. Inclusion of the ALARA principle within Part 20's "Standards for Protection Against Radiation," however, demonstrates an intention to have the ALARA principle—*i.e.* efforts to have occupational doses and doses to the public "as low as is reasonably achievable"—act as a standard for radiation protection. It is true that an ALARA regulation remains in part 50 and, as the Third Circuit emphasized in *In re TMI,* it cautions that the guidelines in the related appendix shall not "be construed as radiation protection standards." 10 C.F.R. § 50.34(a). But the ALARA principle contained in Part 20 makes no mention of the Appendix to Part 50 and contains no such cautionary statement. Moreover, applying ALARA as a standard of care would be consistent with the settled rule that issues of nuclear safety are "reserved to the federal government in general and the NRC specifically." *In re TMI,* 67 F.3d at 1115. In this public liability action, the jury will be bound to apply ALARA, *a federal regulation dealing with the issue of nuclear safety.*

In short, both the ALARA regulation and the numerical occupational dose limits expressed in Part 20 (10 C.F.R. §§ 20.1101 and 20.1201, specifically) set forth the applicable standard of care in this public liability action[3] Accordingly, Plaintiffs' negligence and reckless and wanton misconduct claims are inappropriate for summary judgment and are matters for trial.

■ With respect to Plaintiffs' claim for negligent infliction of emotional distress, this claim similarly presents a question for the jury. Under their negligent infliction of emotional distress theory, Plaintiffs may recover for "reasonable apprehension" of contracting cancer if their exposure to radiation constitutes a physical impact, and the decision in *Lavelle v. Owens–Corning Fiberglas Corp.*, 30 Ohio Misc.2d 11, 507 N.E.2d 476, 480 (Cuyahoga County Common Pleas 1987), indicates that it does. The *Lavelle* decision represents the relevant law of Ohio on this subject and thus governs the instant case, making Plaintiffs' exposure to radiation the requisite physical impact.[4]

In *Brown v. Centerior Energy Corp.*, 1992 WL 694453 (N.D.Ohio 1992), a case also under the Price–Anderson Act, the Court held that an individual exposed to radiation while doing work at a nuclear power plant could not recover for his emotional injuries resulting from that exposure, because exposure alone, without "objective evidence that the exposure caused some actual damage," did not constitute the requisite physical injury. *Id.* at *6. That decision is not controlling here, however, as it failed to acknowledge or distinguish *Lavelle.* While the *Brown* Court did cite a case applying Ohio tort law, *see id.* (citing *Kesecker v. United States Dept. of Energy*, 679 F.Supp. 726 (S.D.Ohio 1988)), that case concerned the law of Ohio regarding intentional torts, not negligence. Accordingly, the decision in *Brown* will not be followed here.

Moreover, application of the *Lavelle* rule in a Public Liability Action is consistent with federal law. As explained above, the occupational dose limits do not represent the only standard of care in such an action. A defendant may be liable for mere exposure if it does not comply with the ALARA standard of care by keeping radiation levels "as low as is reasonably achievable." This is what Plaintiffs contend in the instant case, and, if it is proven, Plaintiffs will be entitled to recover.

■ The Court disagrees with the Magistrate Judge's determination that no genuine issue of material fact existed for trial with respect to whether Plaintiffs have a reasonable fear of contracting cancer or suffered serious emotional distress. Plaintiffs and Defendants offered expert evidence regarding the statistical likelihood of developing cancer. The evidence presented is conflicting and must be resolved at trial.

■ With respect to Plaintiffs' claim for intentional infliction of emotional distress, the recent decision of the Sixth Circuit in *Debevec v. General Elec. Co.*, 1997 WL 461486 (6th Cir.1997), renders it meritless. In that case, which involved a Public Liability Action by an employee against General Electric Company, the Sixth Circuit held that the employee could not recover for exposure to radiation under an intentional tort theory. As the Sixth Circuit held, "[i]n the context of an employment intentional tort, such failure to monitor, warn or test becomes legally significant only if some agent (e.g. radiation or thorium) in fact was introduced into the employee's work environment in quantities *substantially certain to cause injury.*" *Id.* at *3 (emphasis added). Without such a demonstration, the employer cannot be said to have the requisite intent. Although the instant case is more appropriately characterized as an occupational tort case, rather than an employment tort case, the reasoning in

3. Defendants rely on the recent decision of the Sixth Circuit in *Debevec v. General Elec. Co.*, 1997 WL 461486 (6th Cir.1997), as support for the Magistrate Judge's determination that occupational dose levels represent the proper standard of care. But *Debevec* did not involve the question whether ALARA sets forth a standard of

care in public liability actions and, therefore, does not govern this case.

4. Alternatively, Plaintiffs may recover for negligent infliction of emotional distress in the absence of a physical injury if the distress is *serious. See Lavelle*, 507 N.E.2d at 480–81.

*Debevec* compels the conclusion that Plaintiffs must demonstrate exposure in amounts "substantially certain to cause injury" before they can recover for an intentional tort. Because Plaintiffs have not demonstrated such exposure, their claim for intentional infliction of emotional distress fails.

Plaintiffs' medical monitoring claim is, as the Magistrate Judge found, dependent upon their other tort claims. To the extent those claims remain viable, so does the claim for medical monitoring.

Plaintiffs' strict liability claim is dismissed for the reasons stated by Magistrate Judge Perelman.

Accordingly, Plaintiffs' Motion for Partial Summary Judgment is **DENIED** and Defendants' Cross–Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.**

IT IS SO ORDERED.

### *ORDER*

This matter is before the Court on the Plaintiffs' Motion for Partial Summary Judgment and the Defendants' Cross–Motion for Summary Judgement. For the reasons stated in the Memorandum Opinion issued with this Order, the Plaintiffs' motion is hereby **DENIED,** and the Defendants' cross-motion is hereby **GRANTED IN PART** and **DENIED IN PART.**

Plaintiffs' claim in Count Four for intentional infliction of emotional distress is dismissed for failure to state a claim on which relief can be granted. Plaintiffs' claim in Count Three for strict liability is dismissed as waived by the Plaintiffs. Plaintiffs' remaining claims are appropriate for resolution at trial, which is set for January 13, 1998, at 8:30 a.m. Trial Order mailed contemporaneously with this Order.

IT IS SO ORDERED.

1. A refueling outage is a planned shut-down of a nuclear plant which occurs approximately every two years during which time various maintenance work is performed.

### REPORT & RECOMMENDATION

PERELMAN, United States Magistrate Judge.

Plaintiffs, Owen McCafferty, Dennis Maloney, Terry McLaughlin, Sean McCafferty, Robert Prohaska and Sean Kibane, are insulators who allege injury as a result of having been exposed to radiation while removing insulation at the Davis–Besse Nuclear Power Station (hereinafter "the Plant") in october 1994. Defendants, Centerior Service Company (hereinafter Centerior) and Toledo Edison Company, are jointly licensed by the Nuclear Regulatory Commission (hereinafter NRC) as the operators of the Plant.

The events giving rise to this action are as follows.

On October 7, 1994 Plaintiffs were assigned to remove mirror insulation panels from a steam generator during a refueling outage at the Plant.[1] Because the area in which they were to work was a radiologically restricted work area the radiation protection staff conducted a radiation survey prior to Plaintiffs' entry into the area. Although the radiation protection staff conducted an adequate survey prior to Plaintiff's commencement of work they failed to resurvey the area after the first set of insulation panels was removed and, consequently, failed to discover the presence of airborne radioactive particles. plaintiffs, who were prohibited from wearing respirators while performing the insulation removal, inhaled some of the radiated particles.[2] The total doses of radiation to each individual Plaintiff ranged between 3 millirems and 212 millirems.

As a result of this unplanned exposure the Nuclear Regulatory Commission (hereinafter NRC) issues a notice of violation to Centerior in which the following findings were made:

> On October 7, 1994, the licensee did not perform surveys to assure compliance with 10 C.F.R. 20.1701, which requires that licensees use process or other engineering

2. The record offers as a reason for a prohibition against the use of respirators that it is believed that workers are often more efficient without them and that, on balance, the increased efficiency lessens overall radiation exposure even though it may increase internal vs external exposure.

controls to control the concentration of radioactive material in air. Specifically, an evaluation of the contamination levels underneath insulation on the east once through steam generator hot leg was not performed to determine if engineering controls were required to control the concentration of radioactive material in air.

On August 7, 1995, Plaintiffs initiated this action alleging jurisdiction under the Price-Anderson Act, 42 U.S.C. § 2210, as amended in 1988, (hereinafter the Amendments Act) and advancing claims under state law theories of negligence, strict liability, intentional infliction of emotional distress, reckless and wanton misconduct, negligent infliction of emotional distress, and negligent infliction of severe and debilitating emotional distress. The complaint includes a claim seeking medical monitoring.

Subsequent to the filing of the complaint Centerior issued an edict prohibiting Plaintiffs from working in any Centerior facility including the Perry Nuclear Power Plant [3] as well as the Davis-Besse Plant. Plaintiffs responded by filing an administrative complaint with the United States Department of Labor alleging that their ouster from Centerior facilities was in retaliation for filing their complaint and was in violation of Section 211 of the Energy Reorganization Act. Defendants offered as a defense to that administrative complaint that the ban against Plaintiffs was due to Plaintiffs' assertion in the district court complaint that they were suffering from severe and debilitating emotional distress and that Defendants were concerned that it would be dangerous to have workers in a nuclear plant who were suffering from such emotional upset.

After a hearing the Administrative Law Judge (hereinafter ALJ) found in favor of Plaintiffs stating:

Accordingly, it is determined that the complainants have met their burden of showing that Centerior's proffered reasons for the firing of Maloney and banning of the other complainants are pretextual. They have shown by the clear preponder-

ance of the evidence that Centerior's actions terminating Maloney and banning the other five complainants were a deliberate retaliation for their filing the civil complaint under the Atomic Energy Act.

On October 30, 1995 Plaintiffs amended their claim for intentional infliction of emotional distress to add allegations of retaliatory conduct.

On October 28, 1996 Plaintiffs moved for partial summary judgment seeking judgment as to Defendants' liability on their claims for negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. Defendants responded with a cross-motion seeking summary judgment on all of Plaintiffs' claims.

The disposition of a motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides for the granting of such motion where, "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court succinctly stated the standard for granting a motion for summary judgment as follows:

the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* at 322, 106 S.Ct. at 2552.

Such showing by the nonmovant must consist of more than a mere "scintilla" of evidence, or the hope that the court will disbelieve the movant's denial of a disputed fact. The non-moving party must present plausible evidence in support the facts which are deemed material under the substantive law applicable to the cause of action. *Street v.*

---

**3.** Centerior is co-licensee with the Cleveland Electric Illuminating Co. as operators of the Per-

ry Nuclear Power Plant.

*J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989) (discussing the "new era" of summary judgment practice established in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Although the court's function under such a motion is to determine whether a genuine issue of material fact exists, as opposed to endeavoring to resolve any such factual issues, *Tee–Pak, Inc. v. St. Regis Paper Co.,* 491 F.2d 1193 (6th Cir.1974); 6 *Moore's Federal Practice* ¶ 56.15 [1.–0]., the court has discretion in weighing the evidence offered by the non-moving party, considered in light of the record as a whole, to determine whether that party's evidence does "more than simply show that there is some metaphysical doubt as to the material facts" or whether it demonstrates that the non-moving party's claims are "implausible." *Street,* 886 F.2d at 1479–1480. Further, in making that determination the court has no duty to independently search the record for the existence of genuine issues of material fact. *Id.* at 1479.

Plaintiffs contend that their complaint constitutes a "public liability action" (hereinafter PLA) governed by the Amendments Act. "Public liability" is defined in 42 U.S.C. § 2014(w) as "any legal liability arising out of or resulting from a nuclear incident." "Nuclear incident" is in turn defined as "any occurrence ... causing ... bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or by-product material." 42 U.S.C. § 2014(q). Plaintiffs maintain that their state claims constitute the substantive law underlying a PLA action pursuant to 42 U.S.C. § 2014(hh) which provides:

> The term "public liability action", as used in section 2210 of this title, means any suit asserting public liability. A public liability

action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section.

In response and in support of their motion for summary judgment Defendants assert that the Amendments Act does not contemplate adoption of state substantive law and that Plaintiffs' claims fail to satisfy the federal common law elements of a PLA. In the alternative, Defendants argue that even if Ohio's substantive law were to be employed Plaintiffs cannot satisfy the elements of those causes of action.

The first issue placed before this Court relates to the basic question of what kind of animal a PLA is. Some legislative chronology provides background and puts the Amendments Act in its proper context.

Congress' regulation of nuclear power began in 1946 with the Atomic Energy Act which gave the federal government a monopoly on nuclear energy. *Duke Power Co. v. Carolina Env. Study Gp.,* 438 U.S. 59, 63, 98 S.Ct. 2620, 2625, 57 L.Ed.2d 595 (1978). Finding that the exploitation of nuclear power would be better served by participation by the private sector, in 1954 Congress established the Atomic Energy Commission which had the authority to license and regulate nuclear facilities. *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1095 (7th Cir.), *cert. denied,* 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994). In a further attempt to spur private development of nuclear energy Congress enacted the Price–Anderson Act in 1957, 42 U.S.C. § 2210, which provided for limitations on potential liability of private actors in the nuclear energy field and offered indemnification by the federal government for liability over a specified amount. *Id.* The Price–Anderson Act was extended and expanded in 1966 mandating that those who sought federal indemnification for extraordinary nuclear occurrences (hereinafter ENO) [4] give up certain common

---

**4.** An ENO "means any event causing a discharge or dispersal of source ... material from its in-

tended place of confinement in amounts offsite, or causing radiation levels offsite, which the

law defenses, thereby creating a strict liability action. The amendment also allowed for removal to federal court of any claims arising out of an ENO. *Corcoran v. New York Power Authority,* 935 F.Supp. 376, 384 (S.D.N.Y. 1996).

In 1988 the Price–Anderson Act was again amended by the Amendments Act which created "public liability actions" and provided:

> With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place, . . . shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy. Upon motion of the defendant or of the commission, or the Secretary, as appropriate, any such action pending in any State court ... shall be removed ... to the United States district court having venue under this subsection.

42 U.S.C. § 2210(n)(2).[5]

A primary area of contention between the parties relates to the significance of the mandate of § 2014(hh) regarding the use of rules of the state as the substantive rules of decision in a PLA in the district court. Defendants attempt to limit the language to procedural and administrative state rules such as statutes of limitations (to the extent that they are procedural), venue, privileges, joinder, and damages. Defendants assert that a PLA is a federal common law action in which a plaintiff must prove that he/she was exposed to amounts of radiation higher than those found in 10 C.F.R. § 20.1201 "Occupational Dose Limits"[6] and that the defendant caused such exposure. Defendants argue that Plaintiffs' exposures, ranging from 3 millirems to 212 millirems are, by definition, noncompensable as the occupational dose limits found in the foregoing regulations allow annual exposure of 5000 millirems.

Plaintiffs contend that the language of § 2014(hh) requires application of the substantive law of Ohio, and, while agreeing that federal standards apply in a negligence action, argue that it is not the occupational dose limits which set the standard but, rather, the duty of care found in 10 C.F.R. § 20.1101 which provides in part: "The licensee shall use, to the extent practicable, procedures and engineering controls based upon sound radiation protection principles to achieve occupational doses and doses to members of the public that are as low as is reasonably achievable (ALARA)."

Interpretation of the language of § 2014(hh) is problematic. At first blush the Amendments Act may appear to be a jurisdictional grant which does nothing more than move state tort claims to a federal forum. Because such result is prohibited by Article III, § 2, of the United States Constitution, however, circuit courts addressing the issue have uniformly interpreted the Amendments Act as "relying for definition upon state law elements, [while still] contain[ing] the federal components necessary to survive the constitutional challenge mounted." *In re TMI Litigation Cases Consol. II,* 940 F.2d 832, 857 (3rd Cir.1991), (hereinafter *TMI II*) *cert. denied,* 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992).[7] *See also, O'Conner,* 13 F.3d at 1100.

Although the present action does not challenge the constitutionality of the Amendments Act the analysis of that issue involves discussion of the interaction of state and

---

[NRC] ... determines to be substantial, and which the [NRC] ... determines has resulted or will probably result in substantial damages to persons offsite or property offsite." 42 U.S.C. § 2014(j).

**5.** That amendment also added the language of § 2014(hh) previously alluded to concerning derivation of the rules of the state in which the incident occurred as the substantive rules of decision in the federal court.

**6.** The occupational dose limits found in the regulations provide:

(a) The licensee shall control the occupational dose to individual adults, except for planned special exposures under § 20.1206, to the following dose limits.
(1) An annual limit, which is the more limiting of—
(I) The total effective dose equivalent being equal to 5 rems (0.05 Sv)

**7.** The 1979 Three Mile Island incident in Pennsylvania spawned a number of cases which called for analysis of various aspects of the Amendments Act.

federal law within its parameters and is, therefore, relevant to the issue presented herein.

In *TMI II*, 940 F.2d at 832, the Third Circuit court reviewed a decision by the district court remanding certain PLAs to the state courts on the basis that the Amendments Act overstepped the bounds of Article III. Recognizing substantial ground for disagreement with its decision the district court certified the jurisdictional question to the circuit court.

The Third Circuit reiterated the concept that in order to "arise under" the laws of the United States a statute must do more than confer federal jurisdiction and went on to determine to what extent the laws of the state were to govern a PLA. The court began its analysis with the definition of PLA as encompassing "'*any* legal liability' of any 'person who *may* be liable' on account of a nuclear accident," *id.* at 854, and went on to the proposition that the Amendments Act completely did away with state causes of action for nuclear incidents, stating that "A claim growing out of any nuclear incident is compensable under the terms of the Amendments Act or *it is not compensable at all.*" *Id.* (emphasis in original).

Contrary to signifying that state substantive tort law was thereby rendered irrelevant, however, the court determined that, as in the case of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(2)(A), which specifies that the laws of the adjacent states are "to be the law of the United States," the Amendments Act "refers to substantive rules for decision as 'derived from state law.'" *Id.* at 856. The court went on to state that "[w]e believe that the language adopted in the Amendments Act supports our view that Congress intended that the [state] rules of decision constitute federal law." *Id.* The court concluded that once the factual predicate of a PLA is met all state causes of action based upon the nuclear incident giving rise to the PLA become federal law which, where inconsistencies exist, are shaped by the provisions of the Amendments Act.

The same issue was addressed by the Seventh Circuit in *O'Conner*, 13 F.3d at 1090, in which the plaintiff, a pipefitter who worked at a nuclear facility, brought an action in state court alleging that he had been negligently exposed to radiation, causing him to develop cataracts. The action was removed to federal court as one under federal law and a constitutional challenge to the court's jurisdiction was launched by the plaintiff seeking to have the action remanded to state court. The Seventh Circuit began its constitutional analysis finding that the Act contained federal components such as provisions relating to statute of limitations, venue, punitive damages, and waiver of defenses, which made it more than just a jurisdiction conferring enactment. The court further stated that "[state] law serves as the basis for the cause of action only as long as state law is consistent with the other parts of the Act. Congress desired that state law provide the content for and operate as federal law; however, Congress recognized that state law would operate in the context of a complex federal scheme which would mold and shape any cause of action grounded in state law." *Id.* at 1100.

The Sixth Circuit recently joined the Third and Seventh Circuits in addressing the constitutionality of the Amendments Act and, specifically adopting the reasoning of *TMI II* and *O'Conner*, found that the legislation relies on state law elements for definition but contains the federal components necessary to survive constitutional challenge. *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1549 (6th Cir.1997) (quoting *TMI II*, 940 F.2d at 857.) In that opinion the court reiterated dictum from *Day v. NLO. Inc.*, 3 F.3d 153, 154 n. 1 (6th Cir.1993) that "[t]he amendment was not intended to alter the state law nature of the underlying tort claims." *Nieman*, 108 F.3d at 1549.

Having found that state and federal law function in tandem the court in *Nieman* went on to address preemption of state law by the Amendments Act. Historically, the Price–Anderson Act has been held to preempt all state causes of action regulating nuclear safety while leaving intact state laws only indirectly relating to nuclear safety or which constitute economic regulation rather than safety regulation, even though there may be an indirect effect on safety standards. *Silk-*

*wood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984).[8] Acknowledging the change in the Price–Anderson Act promulgated in 1988 the court found that the Amendments Act resulted in any cause of action arising out of a nuclear incident being supplanted by federal law. Speaking to this issue the court concluded:

> Because the Price–Anderson Act, as amended in 1988, specifically dictates that state law applied only to the extent it is not inconsistent with federal law and because we agree with the analyses of preemption in *O'Conner* and *TMI II*, we hold that Price–Anderson Act preempts Nieman's state law claims; the state law claims cannot stand as separate causes of action. Nieman can sue under the Price–Anderson Act, as amended, or not at all. His federal claim will be derived from state law, as mandated by § 2014(hh), to the extent it is not inconsistent with federal law. Therefore, our present task, in the posture of review of the district court's grant of defendants' motion to dismiss, is limited to considering whether, viewing the well-pleaded allegations in the complaint in the light most favorable to Nieman, his continuing trespass claim is timely under the Price–Anderson Act.

*Id.* at 1552.

Contrary to Defendants' position, this ruling did not destroy the plaintiff's claim for continuing trespass, but, rather, placed it (largely intact) in the context of federal law, with the court engaging in an extensive analysis of Ohio law concerning what constitutes continuing trespass for statute of limitations purposes. That this analysis was deemed appropriate belies Defendants' contention that Congress intended that PLAs be uniform without regard to the law of the state in which the incident took place. While it may be assumed that all states do not have the same continuing trespass laws (i.e. some may require continuing malfeasance, others may require only continuing damages caused by a singular act of malfeasance, while still others may require failure to remove trespass as constituting a necessary element where the act of malfeasance was discreet), the *Nieman* court was not concerned with the fact that a PLA for continuing trespass in Ohio would differ from a PLA for continuing trespass in another state.

This Court finds Defendants' position as to the elements of a PLA to be disingenuous at best.[9] The language lifted from cases cited in support of their contention that a PLA has two elements without regard to state law are taken out of context and even a cursory reading of the precedents, both circuit court and district court, reveals virtual unanimity on the issue of whether state substantive law, to the extent that inconsistencies are absent, makes up the elements of a PLA. *See, e.g., Bohrmann v. Maine Yankee Atomic Power Co.*, 926 F.Supp. 211, 218 (D.Me.1996) ("state law substantive rules of decision apply, and only those theories of relief that are inconsistent with federal law need be dismissed."); *Corcoran v. New York Power Authority*, 935 F.Supp. 376, 385 (S.D.N.Y.1996) ("the mere fact that all causes of action arising out of a 'nuclear incident' are federal in nature does not eliminate plaintiffs ability to assert claims the rules of decision of which are derived from state law."); *Coley v. Commonwealth Edison Co.*, 768 F.Supp. 625 (N.D.Ill. 1991); *In re Hanford Nuclear Reservation Litigation*, 780 F.Supp. 1551, 1570 (E.D.Wash.1991) ("it appears to the court that its primary purpose was not to *alter*, in

**8.** In *Silkwood*, the Supreme Court upheld an award of punitive damages against the defendant despite the knowledge that such award would likely have the effect of altering safety standards within the nuclear industry in the state of California. The Court found that "Congress was willing to accept regulatory consequences of application of state tort law to radiation hazards even though direct state regulation of safety aspects of nuclear energy was pre-empted." *Silkwood*, 464 U.S. at 251, 104 S.Ct. at 622–623.

**9.** This is particularly so in light of the fact that when representing the plaintiff in *Northeast Ohio Regional Sewer District v. Advanced Medical System, Inc.*, 106 Ohio App.3d 542, 666 N.E.2d 612 (1995) Ohio Eighth Appellate District, defendants' counsel espoused the viewpoint which they now attack, treating with a fair degree of incredulity the stance advanced by the defendant in that action which was reflective of the arguments they now make on behalf of their defendant clients in this action. *See, e.g.* Reply Brief of Appellant Northeast Ohio Regional Sewer District, filed June 20, 1995, pp. 2–5.

the main, that state law which (but for this Act) would be controlling in this area, but rather to *enhance* its effect.")

The conclusion thus mandated is that a PLA preempts state claims which arise out of a nuclear incident, the resulting cause of action, however, being the same as the claim would have been in state court except to the extent that there may exist a conflict between state and federal law in which case federal law prevails. Under this reasoning, all of Plaintiffs' claims which arise as a result of their unintended exposure to radiated materials are preempted by the Amendments Act, and must be analyzed for inconsistencies with that legislation.[10]

With this precept in mind this Court must first determine the elements of Plaintiffs' PLA claims as dictated by the adaptation of state causes of action to the federal nuclear field, and then determine whether there are genuine issues of material fact which preclude summary judgment.

Ohio's law of negligence consists of four elements: (1) duty of care; (2) breach of that duty; (3) proximate causation; and (4) injury. *Jeffers v. Olexo*, 43 Ohio St.3d 140, 143, 539 N.E.2d 614 (1989). The parties agree that federal law governs the duty of care, in that federal regulations specifically delineate amounts of radiation to which a worker may be exposed and any more stringent standard imposed by Ohio law would amount to regulation of nuclear safety, an area wholly controlled by federal regulation. Despite agreement over this basic principle the parties disagree as to the correct federal standard to apply——should it be the occupational dose limits found in 10 C.F.R. § 20.1201, as Defendants contend, or the ALARA standard found in 10 C.F.R. § 20.1101, as advocated by Plaintiffs.

Review of the federal regulations governing safety and licensing standards, as well as case precedent analyzing the issue, leads this Court to conclude that the ALARA standard is relevant to licensing requirements but that the occupational dose limits govern the federal safety standards shaping a defendant's duty of care in a negligence action. Although both the occupational dose limits and the ALARA standard have the ultimate goal of reducing radiation exposure of employees and the public the NRC, in answer to the concern that the concept of ALARA is a philosophical principle which should not be made into a regulatory requirement, stated that ALARA is "an operating principle rather than an absolute minimization of exposures." 56 Fed. Reg. 23366 (1991). The NRC emphasized "the importance of the ALARA concept to an adequate radiation protection program. In order to strengthen this concept, the Commission has adopted a requirement that all licensees include provisions for maintaining radiation doses and intakes of radioactive materials as low as is reasonably achievable as part of their radiation protection programs. . . . It is expressly intended that the level of this program and efforts to document it are commensurate with the size of the licensed facility and the potential hazards from radiation exposure and the intake of radioactive materials." 56 Fed. Reg. 23367 (1991). Thus, ALARA may mean different things in different facilities and strict compliance with ALARA specifications may be suspended to allow for "operational flexibility." 10 C.F.R. § 50.36a(b).

This issue of the correct federal standard was addressed more fully by the Third Circuit in *In re TMI*, 67 F.3d 1103 (3rd Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1034, 134 L.Ed.2d 111 (1996), wherein the parties took an interlocutory appeal on the issues of "[w]hether 10 C.F.R. § 20.105 and 20.106,[11] and not ALARA, constitute the standard of care to be applied in these actions." The court reaffirmed its holding in *TMI II* that federal standards apply as the standard of care, and rejected use of ALARA as setting that standard. In so doing the court discussed the legislative background of

---

**10.** To the extent that Plaintiffs raise a claim for intentional infliction of emotional distress based upon Defendants' retaliatory conduct, rather than their exposure to radiation, those allegations do not state a PLA claim and would be deemed a pendent state claim.

**11.** 10 C.F.R. §§ 20.105 and 20.106 were the provisions governing permissible exposure to people off-premises in 1979, the time the incident in *TMI* occurred.

both the occupational dose limits and ALARA and determined that the occupational dose limits "represent the considered judgment of the relevant regulatory bodies—the Federal Radiation Council, EPA, AEC, and NRC—on the appropriate levels of radiation to which the general public may be exposed." *Id.* at 1113–14. ALARA, on the other hand, having no specific values attached to it, would permit a jury to assign safety standards, a result specifically rejected by Congress in regulating nuclear safety. The court also was persuaded against use of ALARA as the standard by which to judge the defendant's duty of care by the language of 10 C.F.R. § 50.34a, which relates to licensing of private nuclear facilities, which provides as to ALARA that "[t]hese numerical guides for design objectives and limiting conditions for operation are not to be construed as radiation protection standards."

The court in *O'Conner* reached a similar conclusion, finding that Illinois law of negligence would apply the federal standards for maximum allowable dosages as the standard of care, and stating that even if Illinois would not apply that standard any other state imposed duty of care would conflict with federal regulation and the federal standard would prevail.[12] *See, also, McLandrich v. Southern California Edison Co.,* 942 F.Supp. 457, 466 (S.D.Cal.1996) ("this Court, like the courts in TMI and *O'Conner,* finds that it should defer to the expert judgment of Congress and the NRC who, in passing the Price–Anderson Act and promulgating the regulatory guidelines, have carefully crafted a balance between developing nuclear energy and providing safety for workers and the public."); *Bohrmann,* 926 F.Supp. at 220 ("adopting the ALARA standard would result in an ordinary negligence standard and would allow juries to decide issues explicitly reserved to the federal government."); *Coley v. Commonwealth Edison Co.,* 768 F.Supp. 625, 629 (N.D.Ill.1991).

Plaintiffs correctly note that the court in *In re TMI* addressed the regulations as they stood in 1979, at which time the ALARA provision considered was the one contained (then and now) in 10 C.F.R. Part 50, "Domestic Licensing of Production and Utilization Facilities." The 1991 amendments to 10 C.F.R. Part 20, "Standards for Protection Against Radiation," added Subpart B, "Radiation Protection Programs," which provides in part, "The licensee shall use, to the extent practicable, procedures and engineering controls based upon sound radiation protection principles to achieve occupational doses and doses to members of the public that are as low as is reasonably achievable (ALARA)." This Court recognizes that the 1991 inclusion of ALARA in Part 20 lends support to Plaintiffs' position but does not find this consideration persuasive in light of other factors, such as ALARA's status as a flexible principle of operation as opposed to the specific numerical standards set forth in 10 C.F.R. § 20.1201, and Congress' clear intent that the federal government rather than the states regulate nuclear safety. Thus this Court concludes that the standard of care to which a defendant may be held for purposes of a PLA for negligence is that of the occupational dose limits found at 10 C.F.R. § 20.1201.

Applying this standard, this Court believes that Plaintiffs' claims for negligence and for reckless and wanton misconduct[13] fail, for the reason that Defendants did not breach their duty of care.

Plaintiffs seek recovery for negligent infliction of emotional distress under the theories that if they suffered a physical injury, however slight, for which they are entitled to compensation recovery for their resulting emotional distress is warranted, or, alternatively, in the event that no actual physical injury is found that Defendants' conduct caused them to develop a real fear of future injury which gives rise to compensable severe and debilitating emotional distress. Plaintiffs also

---

**12.** Plaintiffs use the holding of *O'Conner* in support of their argument that the ALARA standard is applicable as the duty of care in a PLA negligence action in Ohio. In reading that case, however, it is clear that the *O'Conner* court did not apply the ALARA standard of care.

**13.** As in a negligence action, an action for reckless and wanton misconduct requires that the defendant breach a duty of care. *Sicard v. Univ. of Dayton,* 104 Ohio App.3d 27, 660 N.E.2d 1241 (1995).

seek compensation for Defendants' alleged intentional infliction of emotional distress based upon their prohibition of respirator use, and also upon Defendants' alleged retaliatory conduct.

In a case for intentional infliction of emotional distress a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress; (2) that the defendant's conduct was extreme and outrageous; and (3) that the defendant's conduct was the proximate cause of plaintiffs serious emotional distress. *Phung v. Waste Mgt., Inc.,* 71 Ohio St.3d 408, 644 N.E.2d 286 (1994). The mental anguish must be of a degree that no reasonable person could be expected to endure. *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 374–75, 453 N.E.2d 666 (1983); *Retterer v. Whirlpool Corp.,* 111 Ohio App.3d 847, 855, 677 N.E.2d 417 (1996).

Although historically a plaintiff could not recover for negligent infliction of emotional distress in the absence of physical injury, *Miller v. Baltimore & Ohio S. W. R. Co.,* 78 Ohio St. 309, 85 N.E. 499 (1908), Ohio now recognizes such a claim "in such instances as where one was a bystander to an accident or was in fear of physical consequences to his own person" *High v. Howard,* 64 Ohio St.3d 82, 85–86, 592 N.E.2d 818 (1992). Fear of physical consequences must be based upon a real physical peril rather than an imagined or non-existent one. *Heiner v. Moretuzzo,* 73 Ohio St.3d 80, 85, 652 N.E.2d 664 (1995). In those instances the emotional distress must meet the higher standard of being severe and debilitating. *Paugh v. Hanks,* 6 Ohio St.3d 72, 451 N.E.2d 759, syllabus 3a, (1983).

Where, as in this case, a claim involves negligent infliction of emotional distress with allegations of a concomitant physical injury, such as exposure to a harmful substance, a plaintiff may recover for his/her reasonable fear of contracting cancer. In *Lavelle v. Owens–Corning Fiberglas Corp.,* 30 Ohio. Misc.2d 11 (1987) the court stated that "Ohio

courts have not specifically addressed the issue presented here but the general policy of this state has been to permit recovery for reasonable apprehension of a potential harm flowing from a present injury." Id. at 14. In *Lavelle* the plaintiff suffered from asbestosis and advanced a claim for emotional distress based upon his fear of contracting cancer. The court permitted the plaintiff to introduce evidence at trial on the statistical likelihood of developing cancer and his reasonable fear of that consequence.

Accepting for the sake of decision that *Lavelle* represents the current Ohio law on this subject, this Court finds that Plaintiffs have failed to demonstrate the existence of facts which would support their claims for negligent and intentional infliction of emotional distress under Ohio law.[14]

With respect to Plaintiffs' allegation that they have *a reasonable* fear of contracting cancer this Court finds their evidence lacking. Plaintiffs submitted an affidavit from Oddvar F. Nygaard, Ph.D., President Emeritus in the Department of Radiology/Radiation Biology at Case Western Reserve University School of Medicine, who averred that "It is my opinion that the Plaintiffs in the instant action were subjected to an unwarranted increased risk of potential adverse health effects, however small, due to the internal deposition of radiation from the October 7, 1994 exposure incident." This Court finds that this averment addresses only a theoretical likelihood of contracting an illness of unspecified nature and does not contradict the counter averment of Defendants' expert, Dr. Richard R. Monson, that "[t]he science of epidemiology is unable to prove that low doses of radiation, such as doses of 2,000 millirem (2 rem) or less, have any harmful effect on persons so exposed."

Even if Plaintiffs could show that their radiation exposure increased the risk of contracting cancer they have failed to present

14. Defendant argues that Plaintiffs' emotional distress claims must fail because the radiation to which they were exposed did not violate Defendants' duty of care. Although this Court can conceive of instances in which a defendant's conduct would meet the elements of an Ohio emotional distress claim even though the con-

duct was otherwise legal, the effect of this Court's finding that Defendant did not breach its duty of care need not be decided here as Plaintiffs have failed to present evidence of the serious emotional distress necessary to support those claims under Ohio law.

evidence that they have suffered serious emotional distress as a result of that increased risk (or as a result of any other conduct of Defendants).

Plaintiffs contend that they are relieved of the need to offer proof of their severe emotional distress by reason of admissions made by Defendants during and after the Labor Board hearing in which Defendants offered as their non-retaliatory reason for black-balling Plaintiffs the fear of having someone suffering from severe debilitating emotional distress working in a nuclear plant,[15] arguing that Defendants' position at the administrative hearing is *res judicata* in this matter.

This Court disagrees on two counts.

The estoppel doctrine advocated by plaintiffs provides that a federal court shall accord a state court judgment the same preclusive effect it would be given under the law of the state in which the judgment was rendered. *Spence v. TRW, Inc.*, 92 F.3d 380, 382 (6th Cir.1996); *In re Bursack*, 65 F.3d 51, 53 (6th Cir.1995). Ohio law dictates that such estoppel only exists in the presence of four elements:

(1) the party against whom estoppel is sought was a party or in privity with a party to the prior action;

(2) there was a final judgment on the merits in the previous case after a full and fair opportunity to litigate the issue;

(3) the issue must have been admitted or actually tried and decided and must be necessary to the final judgment; and

(4) the issue must have been identical to the issue involved in the prior suit.

*Anderson v. Lorain Cty. Title Co.*, 88 Ohio App.3d 367, 371–72, 623 N.E.2d 1318 (1993). "[A]n absolute due process prerequisite to the application of collateral estoppel is that the party asserting the preclusion must prove that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action." *Goodson v. McDonough Power Equipment, Inc.*, 2 Ohio St.3d 193, 201, 443 N.E.2d 978 (1983).

To the extent that the question of Plaintiffs' alleged emotional distress was pertinent to the issues presented at the administrative hearing the ALJ found that Defendants' alleged belief of Plaintiffs' allegations of emotional distress did not form the basis for Defendants' decision to blackball them. Thus, there was no judicial finding, which could be binding in this action, that Plaintiffs actually suffered from such distress.

Second, Plaintiffs have offered little proof of any emotional distress from which this Court could conclude that the elements of a claim for negligent or intentional infliction of emotional distress are satisfied. The only evidence that Plaintiffs present in support of their contention that they suffered severe and debilitating emotional distress is the following excerpt from Mr. Maloney's testimony at the administrative hearing:

Q. And in your complaint when you say that you've had emotional distress does the fact that you set off every alarm in the plant for a month after this incident have anything to do with your emotional distress?

A. Yes, that's where the emotional distress is. I mean it goes to bed with you at night. You think of your family. You think of everything that it possibly could be doing inside of you no matter what they tell you. You don't know. Especially if you're setting monitors off before you even walk in them. That's not something they teach in those classes.

No Plaintiff has presented evidence of a need for, or seeking, psychiatric or psychological counseling, or of physical effects of their extreme distress, such as headaches, nausea, or any other manifestation of emotional upset. It is uncontroverted that Plaintiffs continued to work at nuclear facilities until they were either laid off or blackballed.

This being so, in this Court's opinion Mr. Maloney's statement at best reflects increased concern with respect to the effects of radiation exposure, an emotional reaction with which this Court might sympathize but one which is plainly insufficient to sustain an

---

15. Plaintiffs specifically rely upon Defendants' comment to a Plain Dealer reporter after the hearing that "We don't want someone with serious emotional distress working inside our plant."

action for intentional or negligent infliction of emotional distress.

■ In their motion Defendants claim entitlement to judgment on Plaintiffs' claim for strict liability on the basis that such claim is inconsistent with federal law. In their brief in opposition to Defendants' motion for Plaintiffs do not address Defendants' contention regarding the claim of strict liability. This Court, therefore, deems the claim to be waived.

Plaintiffs' claim for medical monitoring is dependent upon a finding of liability for a substantive cause of action. Having found no genuine issue of material fact as to any of Plaintiffs' claims, this remedial claim must also fail.

In conclusion, it is recommended that Plaintiffs' motion for partial summary judgment be denied, and the Defendants' motion for summary judgment be granted.

June 19, 1997.